DOMBEY, TYLER, RICHARDS & GRIE-
SER, Plaintiff-Appellee,

v.

DETROIT, TOLEDO & IRONTON RAIL-
ROAD COMPANY, Defendant-
Appellant.

No. 15787.

United States Court of Appeals
Sixth Circuit.

Sept. 30, 1965.

John D. Holschuh, Columbus, Ohio, Alexander, Ebinger, Wenger & Holschuh, Columbus, Ohio, on brief, for appellant.

C. Richard Grieser, Columbus, Ohio, for appellee.

Before CECIL and O'SULLIVAN, Circuit Judges, and SMITH,* District Judge.

O'SULLIVAN, Circuit Judge.

Plaintiffs-Appellees, Dombey, Tyler, Richards & Grieser, a Columbus, Ohio, law firm, recovered a $12,500 judgment against the appellant Detroit, Toledo & Ironton Railroad as their contingent fee under a representation contract with an injured railroad workman, one Craig. Whatever services these attorneys provided Craig were performed between November 14 and November 17, 1960, and consisted of the interview with Craig on November 14th at which they obtained the contingent contract, the opening of a file on the matter and one or two telephone calls to Craig on November 17. On that date Craig, with the knowledge and consent of the plaintiff attorneys, made a direct settlement of his claim against the defendant railroad for the sum of $50,000 and some other benefits. Plaintiffs' complaint charges the railroad with liability for their contingent fee of 25% of $50,000 on the ground that the settlement with Craig constituted an intentional interference with their representation contract, and also on the ground that the railroad had promised to be responsible for Craig's contractual debt to them for their fee. The District Judge found for plaintiffs upon a holding that defendant had intentionally interfered with the plaintiffs' representation contract with their client Craig and had induced Craig to rescind such contract. Dombey, Tyler, Richards & Grieser v. Detroit, Toledo & Ironton Railroad Company, 226 F.Supp. 345 (S.D.Ohio, 1964). The District Judge allowed plaintiffs 6% interest on the $12,500 award from November 17, 1960, the date when the railroad settled with Craig. Jurisdiction is founded on diversity of citizenship.

By agreement of the parties this case was submitted to the District Court, sitting without a jury, on the pleadings and depositions taken by the parties. From such depositions and the findings of the Court, it appears that Carl K. Craig, an employee of the Detroit, Toledo & Ironton, was injured in a work accident on October 11, 1960. Craig's injuries were serious and required almost immediate amputation of his left leg above the knee. Although plaintiffs state that Craig had a "valuable" and "dangerous" claim against the railroad, we have no information that would permit any conclusion as to the validity of such adjectives unless we assume that now all FELA claims are "valuable" and "dangerous."

Shortly after Craig's injuries, a report of his accident went to the Grand Lodge of the Brotherhood of Railroad Trainmen. This was promptly followed by a series of visits by one Taylor who was then an "investigator" for a Chicago law

---

* District Judge Talbot Smith of the Eastern District of Michigan.

firm, Henslee, Monek and Henslee, and who solicited Craig to hire that firm to handle whatever claim Craig might have against the defendant railroad. The Chicago lawyers were among the Brotherhood's designated regional counsel. Notwithstanding some five visits to Craig at the hospital and at his home, Taylor was unable to get the business for his Chicago principals. Taylor requested Craig to write a letter to the Chicago firm asking them to come and see him. Craig refused. Thereafter Crawford, the local representative of the Brotherhood, continued to visit Craig, who asked concerning his hospital and doctor bills "and stuff like that" and requested that Crawford arrange for him to talk to somebody from the Lodge about these matters. Although Craig did not ask Crawford to get him a lawyer, Crawford asked Craig if he would see someone from the office of the plaintiff law firm. Craig agreed and Crawford brought plaintiffs Dombey and Richards to the Craig home on November 14. Dombey's firm was identified as being regional counsel for the Brotherhood. At this meeting, Dombey and Richards discussed matters with Craig and finally entered into an agreement giving their firm the exclusive right to prosecute Craig's claim and providing that the firm was to get 25% of any sum received through suit or settlement, "in consideration of services ren-

dered." Plaintiff Richards said that Craig's wife counseled against signing the contract, saying that "you shouldn't be rushing into these things," but Craig said "I am going to have to have somebody help me on this. I'm going to sign this." Thereupon, Mrs. Craig began to cry, but was comforted by Dombey's assurance that they could have twenty-four hours to consider it and by Richards' statement that "we will hold it for a couple of days." In all events, it is clear that Craig thereafter considered the contract in force. Dombey and his partner thereupon went off on a hunting trip and did nothing in connection with Craig's claim except to open a file on the matter, send a letter [1] of representation to the railroad, and call Craig on the morning of November 17 with regard to living expenses.[2]

Between the date of Craig's injury and November 17 a claims representative of the railroad had called on Craig several times, but until then no talk of settlement was had. In the evening of November 17, two railroad representatives, one Woodard and another, called on Craig at his home and after some discussion offered him $50,000 in settlement of his claim against the railroad. Craig asked for an hour to consider the matter and the railroad representatives then left the Craig home. Craig told Woodard that he had made an agreement with the Dombey

1. This letter had not yet been received by the railroad when the involved settlement was concluded.

2. Craig testified that at the November 14 meeting, upon inquiry as to what he was to live on, Dombey or Richards said "they would take care of that, that they would allot me so much a month or whichever way we wanted to handle it, as far as living expenses," and that such advances were usually sent out "twice a month, on the 15th and 1st of the month" and that upon settlement Craig would have to repay such advances. Craig testified that the subject of what would happen as to these advances if nothing was recovered was not discussed.

Plaintiff Richards' account of the talk as to advances to Craig was to the effect that Craig spoke of the railroad

offering to advance him money to live on; that Craig was concerned as to future expenses to take care of the family before "he began to draw railroad benefits, or something, and this had not been resolved." Richards stated that "before I left the understanding was that I was to get in touch with him as to whether he was going to be able to get along with just the railroad benefits," and concluded that there was no agreement that the Dombey firm would advance Craig money.

Craig further testified that on the morning of November 17, plaintiff Richards called him and "wanted to know about advancing me money to live on, expenses and so forth, until there was a decision reached on this case"; that Richards called "to see if I needed anything" but could not recall whether a certain amount was agreed on or not.

firm to represent him, but Woodard was not shown the agreement nor specifically advised that it involved a contingent fee. After the railroad men left, Craig called the local representative of the Brotherhood, Crawford, and told him that he was inclined to accept the settlement offer. Crawford called Dombey's partner. Dombey was notified and called Craig, telling the latter that he would be a "damn fool" to settle for $50,000, but to go ahead if he wished. As witnesses, Dombey, Craig and Woodard disagreed as to what was said by Dombey concerning his fee. It appears that Dombey and Craig were talking on the phone when Woodard returned to the Craig house. Dombey's account was that he told both Craig and Woodard on the telephone that he expected that his fee would be taken care of by "responsible parties" and specifically to Woodard that he "expected him to take care of our fee in the event that he settled the case with Craig." Dombey said that no amount of fee was mentioned to Craig or Woodard, but he assumed that Woodard would know that he had a contingent fee agreement [3] even though he (Dombey) did not say so. The claim agent Woodard testified that he could not recall Dombey saying that he would expect the railroad to pay his fee and that Dombey made no reference to a contingent contract but merely advised "you know we represent that boy." Craig testified that Dombey said "what fee he had coming he was going to collect it" and that his fee would be only a nominal one. The District Judge found as a fact, however, that Dombey did not use the term "nominal fee" upon his view that an experienced personal injury attorney would not waive a valuable contract right "by telling a client over the telephone that he would charge only a nominal fee." We cannot say that such a finding of fact was clearly erroneous.

Immediately following Dombey's November 17th conversation with Craig and Woodard, Craig requested that the railroad agree to be responsible for any fee that he might owe Dombey. Such an agreement was finally made, the railroad promising to be responsible for "any settlement to be made to the law offices of Dombey, Tyler, Richards & Grieser * * * for any fees that is owed to them till 11:30 P.M., November 17, 1960." At the same time, the claim agent typed a letter from Craig to Dombey stating that "I have decided to negotiate a settlement * * * in my own behalf," and that "this will be a notice that your services are no longer needed. You may issue a bill for services thus far rendered." Because this letter is important to the question of interference with Dombey's contract to represent Craig, we note that the District Court merely found that it was "prepared" by railroad representatives. The claim agent testified clearly that he merely typed such letter as dictated by Craig and his wife after Mrs. Craig experienced difficulty in attempting to type it on her own machine. Craig stated that he asked the agent to type it for him on the agent's portable typewriter.

Relevant also to the question of interference with the representation contract is the claim agent's testimony that although he knew Craig had retained counsel, he did not see the contract itself and understood from Craig that only a nominal fee was to be charged. The District Court found that the agent knew the contract was based on a contingent fee, but we have not been pointed to the testimony underlying this finding. Plaintiffs in their brief rely instead on the assertion that an experienced claim agent must be aware of the universal custom of attorneys to use such contracts in such cases, but we do not deem it important to determine whether this assertion is sufficient to support the District Court finding in view of our holding that in any event the claim of intentional interference has not been made out.

About a week after the settlement, plaintiff Richards came to the Craig

---

3. Dombey said that the percentage in such contingent contracts "depended on cases," and agreed that "it varied from case to case."

home and, as recounted by Craig, "He wanted me to sign a statement saying that I had requested that his firm represent me, that they come and see me, that I requested for them to come and * * * discuss this case—that was prior to November the 14th—which I did not. Mr. Crawford [the Brotherhood representative] was the go-between. He is the one that asked if I would talk to these people." Craig did not sign the requested statement. At the same interview, plaintiff Richards said to Craig that the plaintiffs "had nothing a'gin me as far as any legal fees * * * that it would be between the D. T. & I. Railroad" and plaintiffs. The proposed statement, an exhibit to Craig's testimony, states that plaintiffs came to see him "at my request."

We consider that three questions are presented by this appeal. First, was there an intentional interference by defendant with the contractual relationship between plaintiffs and Craig; second, were the plaintiff attorneys entitled to recover as third party beneficiaries of the defendant railroad's agreement to be responsible for any fee that Craig would owe them; and, finally, was the contract between plaintiffs and Craig unenforceable as being champertous and against the public policy of the State of Ohio.

### 1) Defendants charged interference with contract.

▉▉ The District Court concluded from the foregoing facts that,

"[t]he manner in which the defendant railroad company * * * effected the settlement * * * and especially the inducing of Craig to sign and mail the * * * letter [terminating further legal services] constituted intentional interference with the contractual relationship between plaintiff and Craig." 226 F.Supp. 348. (Emphasis supplied.)

Our examination of the controlling Ohio law convinces us that this conclusion cannot stand.

The fundamental principle from which analysis must begin is that a representation contract which restricts a tort claimant's right to settle his claim without his attorney's consent is completely void and unenforceable. E. g., Davy v. Fidelity & Cas. Ins. Co., 78 Ohio St. 256, 267, 85 N.E. 504, 17 L.R.A.,N.S., 443 (1908). In recognition of this principle no claim is made that the mere fact of settlement between Craig and the railroad would in any way interfere with plaintiffs' representation contract. We are unable to find anything in the "manner" of settlement which changes the application of this principle.

Most basically, there is no showing that Craig has ever, in any manner, attempted to repudiate his representation contract or refused to pay a bill for services rendered. To the contrary, it is conceded by all that no bill was ever presented to him and that plaintiffs intended to look solely to the railroad for their compensation. The letter from Craig relied on to show some interference with the representation contract simply asks for "a bill for services thus far rendered." On its face the letter recognizes the contract and evinces Craig's willingness to comply with its obligations, whatever they might be. Nothing in the record indicates that a bad faith motive prompted this seemingly innocent letter. And the assertion in plaintiff's brief that a request for a bill for services rendered is inconsistent with the written terms of the contingent fee contract amounts to no more than a tacit recognition that no services were rendered and a claim (which we shall shortly examine) that the full contingent fee is nonetheless owing; the most that can be said is that the letter reflects a determination to pay no more than Craig was legally obligated to pay. Finally, it should be remembered that even if this letter were somehow construed as a denial of Craig's contract obligations the only evidence in this record is that Craig himself was responsible for the language chosen.

Thus there is no showing that anyone interfered with or attempted to deny Craig's obligations under the representation contract. Even if some repudiation could be made out, moreover, it affirmatively appears that the railroad, the only defendant here, promised to be responsible for any fees owed plaintiffs. How this undertaking can be squared with a finding that defendants interfered with plaintiffs' rights is unclear. By this agreement the railroad undertook to pay the full contingent fee unless it could be shown not to be legally due plaintiffs or perhaps unless it could be shown that the railroad's agent in good faith believed that plaintiffs had agreed to accept a lesser sum. None of these alternatives is consistent with a finding that the railroad interfered with plaintiffs' contractual rights.

### 2) Status of plaintiffs as third party beneficiaries.

■■■ Ohio recognizes the general right of a third-party beneficiary to sue on a contract intended for his benefit. E. g., Visintine & Co. v. New York, C. & S. L. R.R., 169 Ohio St. 505, 160 N.E. 2d 311 (1959). And at least one Ohio court has expressly anticipated a situation much like that presently confronting us. Hawke v. Baltimore & O. S. W. Rd., 9 Ohio App. 195, 199 (1917). Our examination of the railroad's agreement and the circumstances surrounding its inception convince us that it was intended that plaintiffs be able to look directly to the railroad without first dunning Craig, but that the railroad would only be required to discharge any legally binding obligations of Craig.

■■■ Many possible defenses to payment of the full contingent fee are presented for our consideration.. We find no merit in defendant's claim that the representation contract is vitiated by the manner in which the Brotherhood local

chairman recommended plaintiffs' services. In Brotherhood of R.R. Trainmen v. Virginia ex rel. State Bar, 377 U.S. 1, 8, 84 S.Ct. 1113, 1118, 12 L.Ed.2d 89 (1964), the Supreme Court determined that the Brotherhood is constitutionally protected in carrying out its plan "for advising workers who are injured to obtain legal advice and for recommending specific lawyers." Any contrary view as to the legality of plaintiffs' retainer by Craig because of the manner in which it was obtained (except as to the claim of maintenance discussed hereinafter) is foreclosed by this decision. Thus we need not concern ourselves with the possibility that such conduct might be considered unethical under Section 2 of Rule XIX of Ohio's Rules of Practice, 176 Ohio St. 1xiii (1964) [4] and conceivably under Canon 27 of the American Bar Association Canons of Professional Ethics, 176 Ohio St. 1xxi (1964).[5]

We briefly mention other claims of defendant. The argument that Dombey waived his full fee is lost with the District Court's finding that Dombey did not in fact express his willingness to accept a nominal fee. Adequately supported adverse findings similarly dispose of the claim that the representation contract was void because procured under duress. The railroad has not raised the argument that its undertaking to be responsible for Craig's fees was conditioned on its mistaken belief that only a nominal fee would be charged, nor do we believe it to claim a legal obligation less than Craig's. Thus the defenses of waiver, mistake and duress are without validity.

The most difficult question presented by this case is whether plaintiffs have a right to collect a $12,500 contingent fee for doing virtually nothing. There can be little serious question of the reasonableness of a 25% contingent fee contract as such. Direct precedents are wanting, however, to control decision of the pre-

---

4. "An attorney at law shall not * * * solicit professional employment."

5. "It is unprofessional to solicit professional employment by circulars, advertise-

ments, through touters or by personal communications or interviews not warranted by personal relations." (Emphasis supplied.)

cise problem raised by the events following formation of this particular contract.

Different rules are applied in different states to determine the damages owed an attorney who is *discharged* from a percentage contingent fee retainer *without cause*. E. g., Anno., 136 A.L.R. 231 (1942); 7 Am.Jur.(2d) Attorneys at Law § 256 (1963). Ohio, however, is clearly committed to the rule that the attorney is entitled to his agreed percentage. Bolton v. Marshall, 153 Ohio St. 250, 255, 91 N.E.2d 508 (1950); Roberts v. Montgomery, 115 Ohio St. 502, 154 N.E. 740 (1926); Scheinesohn v. Lemonek, 84 Ohio St. 424, 95 N.E. 913 (1911). This rule applies even though the attorney has done nothing whatever toward earning his fee. Scheinesohn v. Lemonek, supra. Nor do we believe that the analysis adopted by the Ohio Supreme Court in Mahoning County Bar Ass'n v. Ruffalo, 176 Ohio St. 263, 264–265, 199 N.E.2d 396 (1964), cert. denied, 379 U. S. 931, 85 S.Ct. 328, 13 L.Ed.2d 342 (1964), would lead that court to repudiate the result announced in these cases.

Most states follow a parallel rule allowing recovery of the agreed percentage of any settlement arrived at by the client without his attorney's knowledge or consent. Annos., 3 A.L.R. 472 (1919); 40 A.L.R. 1529 (1926); 7 Am.Jur. (2) Attorneys at Law § 257 (1963). Ohio has no such cases dealing with settlement without prior discharge of the attorney. But Roberts v. Montgomery, supra, involved a situation where the attorneys had done substantial work before their client discharged them without cause and then settled his claim. Nothing in the Ohio opinions suggests that the *contractual* liability of Craig and the defendant railroad should be affected by the fact that they did not seek to repudiate the representation contract before settling or by the fact that plaintiffs had performed no work. We emphasize that the settlement involved was made with the knowledge and consent of plaintiff attorneys and we observe again that there was no breach of contract by Craig. The reasons for allowing full recovery of the contingent fee advanced in the Scheinesohn and Roberts cases, indeed, apply regardless of the formal act of discharge. Thus as the court noted in Roberts, a settlement offer may well be prompted because "the wrongdoer has learned that lawyers possessing the skill and ability to recover judgments fully measuring up to the extent of the injuries inflicted have been retained to prosecute the case." 115 Ohio St. 507, 154 N.E.[6] And as ruled in Scheinesohn, the fact that no work has been done does not defeat recovery of the full fee since the parties have agreed on their own price and it is difficult to discover an alternative basis for computing damages absent any performance suitable for quantum meruit recovery.

In short, we believe that Ohio would ordinarily rule that an attorney may recover the full percentage of his contingent fee upon settlement by his client, regardless of the fact that he has performed no work. Part of the rationale for this rule is in effect that the client has bargained not only for the performance of representation services but also for the status of representation; a claimant represented by skilled counsel often gains much simply from their undertaking to furnish whatever services may be needed. Failure to perform actual services, then, is not a failure of the consideration underlying the promise of representation which is both formally and actually the consideration for the promise to pay. At the same time, the client has himself elected to dispense with the services part of his bargain in order to reach a result—settlement—obviously within the contemplation of the parties when their agreement was formed. Thus the

---

6. It seems not amiss to note the following testimony from the record before us:

"Q. Had you performed any services, Mr. Dombey, from the time that you signed Mr. Craig up until this telephone conversation that night, in connection with the Craig case?"

"A. In my own mind? I certainly have. The presence of my name gave him 50,000 bucks."

**128**

suggested Ohio rule is consistent with the general failure of consideration doctrine also recognized by the Ohio courts, e. g., French v. Millard, 2 Ohio St. 44, 51–52 (1853); Darst v. Brockway, 11 Ohio 462, 472 (1842); Henry v. Reich, 80 Ohio App. 185, 187, 72 N.E.2d 500 (1947); 11 Ohio Jur.(2) Contracts §§ 91, 218, 219 (1955).

■ It remains to inquire whether the general rule of Ohio law thus understood should be avoided in the present case because Craig promised to pay a contingent fee "in consideration of services rendered." We are tempted by the circumstances of this case to seize on this particular phrase as an indication that Craig's intentions were significantly different from those of an ordinary contingent fee client as contemplated by Ohio law, and to rule that he anticipated payment only for actual rendition of legal services. But we are forced to conclude that the happenstance of plaintiffs' own choice of phraseology cannot properly be made to alter their significant rights.

### 3) Does public policy forbid recovery by plaintiffs?

We have already observed that the Supreme Court's decision in Brotherhood of R.R. Trainmen v. Virginia ex rel. State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), protects plaintiffs' representation contract against a defense of invalidity based upon the solicitation of Dombey's employment by a representative of the Brotherhood of Railroad Trainmen.

Defendant, however, has also suggested that the representation contract is unenforceable because it included an agreement to maintain Craig until prosecution of his claim was concluded by settlement or litigation. We have above recited in part the testimony which suggests that there was an understanding with Craig that Dombey's firm would advance necessary living expenses to him pending disposition of his claim against the railroad and that nothing was said as to repayment if nothing was recovered from the railroad. While Dombey at one point indicated that no discussion was had with Craig on the matter of advances, at another part he said simply that "if they were discussed to any extent, I don't remember" and indirectly suggested that such maintenance arrangements may be part of his firm's general method of operation by observing that "each case was handled on its own facts and circumstances." Dombey's partner stated that there was no agreement to loan money to Craig, but admitted that "the understanding was that I was to get in touch with him as to whether he was going to be able to get along with just the railroad benefits." Richards further said that he later called Craig and asked whether "he was getting along all right on his benefits, financially." No money was ever paid to Craig by plaintiffs.

The District Judge made no finding as to whether there was an agreement to advance money to Craig for living expenses pending disposition of his claim. Neither did the District Court discuss whether such an agreement would render the representation contract champertous. Such a defense was raised by defendant's answer which charged broadly that the agreement between Craig and plaintiff lawyers "was champertous, contrary to public policy, * * * unenforceable and void." We consider that this defense was presented here by the statement of question "Was the contingent fee contract in the present case unenforceable because it was obtained by the law firm in a manner contrary to public policy?"

■ We believe that the question of champerty remains in the case but cannot be evaluated without resolution of what may or may not be disputed issues of fact as to the existence of an agreement by plaintiffs to "maintain" Craig. In view of the decisions discussed below, we feel it appropriate to remand this case to the District Court for findings upon the facts relevant to this question of maintenance. Since the question was not fully briefed on appeal and its consideration requires a clear understanding of the basic facts, we do not intend the following discussion to establish the firmly

binding law of this case. We are interested instead in pointing out the possibly relevant lines of inquiry and further argument.

▋ Canon 10 of the Canons of Professional Ethics, adopted in Ohio (176 Ohio St. lxv, lxvii (provides that a lawyer "should not purchase any interest in the subject matter of the litigation which he is conducting." The Supreme Court of Ohio has recently held that this Canon prohibits a contingent fee lawyer from advancing money as a loan to a disabled and destitute client to enable him to meet living expenses pending litigation. Mahoning County Bar Ass'n v. Ruffalo, 176 Ohio St. 263, 264–265, 199 N.E.2d 396 (1964), cert. denied, 379 U.S. 931, 85 S. Ct. 328, 13 L.Ed.2d 342 (1964). Reasoning that the disabled client's promise to repay "would not have the effect of providing the attorney with any reasonable source of repayment other than the proceeds received on trial or settlement of his client's claim" the Ohio Court ruled that the loan is in effect a purchase of an interest in the subject matter of the litigation. Reliance was placed on the parallel reasoning underlying the like determination of the Committee on Professional Ethics and Grievances of the American Bar Association, Opinion 288 (1954). The Committee's opinion is also relied on in Janny v. Cleveland Tankers, Inc., 209 F.Supp. 91, 94 (N.D.Ind.1962), where the District Court held that it would "not lend its office to, or in any way, encourage or sanction the practice of attorneys advancing or loaning funds to clients for living expenses * * *." We must accept the Ruffalo decision as a binding rule of Ohio law. We note, however, that in varying contexts such maintenance agreements have withstood a charge that they were champertous. People ex rel. Chicago Bar Ass'n v. McCallum, 341 Ill. 578, 589, 173 N.E. 827 (1930); Johnson v. Great No. Ry., 128 Minn. 365, 369, 151 N.W. 125, L.R.A. 1917B, 1140 (1915); In re Sizer and Gardner, 306 Mo. 356, 375, 267 S.W. 922 (1924); 6 Cyclopedia L. & Proc. Champerty & Maintenance 865 (1903); see

also Grievance Committee of Fairfield County Bar v. Nevas, 139 Conn. 660, 96 A.2d 802, 805 (1953); 7 Am.Jur. (2) Attorneys at Law § 216 (1963); 14 C.J.S. Champerty and Maintenance § 13 (1939); 7 C.J.S. Attorney & Client § 23, pp. 745, 761–762 (1937). These decisions and the general reluctance to apply the full rigors of ancient learning on champerty and maintenance counsel strict interpretation of the Ohio rule.

The reasoning adopted by the Ohio Supreme Court in its Ruffalo opinion suggests that the Canons are not violated if there is a reasonable prospect of repayment without realizing on the client's cause of action. Given such a reasonable prospect, it could no longer be argued that the attorney was necessarily purchasing an interest in the cause of action. Parenthetically, it may also be noted that a prospect of repayment from other sources would reduce the pressure on an attorney to settle a case quickly and cheaply in order to minimize his own commitment and secure his own past investment. On remand, accordingly, it should be inquired whether any arrangement that may be found to have been contemplated included a provision for repayment by Craig independent of the disposition of his claim, and whether there was any tenable prospect of repayment independent of successful disposition of that claim.

▋ It was established as early as the first volume of the Ohio reports that champertous agreements will not be enforced by the Ohio courts regardless of the lack of any statute establishing a broad criminal prohibition of champerty and maintenance. Key v. Vattier, 1 Ohio 132 (1823); *but cf.* Ohio Rev.Code § 2917.43. The Ohio courts have consistently adhered to this principle in varying factual contexts. E.g., Gross v. Campbell, 118 Ohio St. 285, 160 N.E. 852 (1928); Brown v. Ginn, 66 Ohio St. 316, 325, 64 N.E. 123 (1902); Stewart v. Welch, 41 Ohio St. 483, 503 (1885); Weakly ex rel. Bell v. Hall, 13 Ohio 167, 175 (1844); Lo Guidice v. Harris, 98 Ohio App. 230, 235, 128 N.E.2d 842

(1954). It appears, however, to be the Ohio rule that the champertous attorney may still recover the reasonable value of services rendered in quantum meruit. Brown v. Bruner, 10 Ohio App. 314 (1919); see Ong v. Worden, 37 Wkly. Law Bull. 108, aff'd per curiam, 55 Ohio St. 695, 48 N.E. 1115 (1897) (semble); 9 Ohio Jur. (2) Champerty & Maintenance, § 4 (1954); but cf. Rice v. Pigman, 94 Ohio App. 122, 127, 128, 114 N.E.2d 738 (1953). Although allowance of such recovery is characterized by Williston as "anomalous," 6 Williston on Contracts § 1713, p. 4842 (rev. ed. 1938), it appears to be the majority rule. 6A Corbin on Contracts § 1426 (1962); 14 C.J.S. Champerty and Maintenance § 47 (1939); 7 Am.Jur.(2) Attorneys at Law § 229 (1963).

The reasoning of the Ruffalo opinion does not fit squarely into the mould of champerty and maintenance, but the mischief of acquiring a pragmatic interest in the client's cause of action is primarily that of creating a danger of divergence between the attorney's and the client's interests, see Comm. on Prof. Ethics, Opinion 288, supra. A similar danger exists where the attorney undertakes to be personally responsible for the costs of litigation, and the Ohio courts have included such agreements within their proscription of champertous contracts. See the summary of decisions in Reece v. Kyle, 49 Ohio St. 475, 483–484, 31 N.E. 747, 16 L.R.A. 723 (1892); Brown v. Ginn, 66 Ohio St. 316, 325, 64 N.E. 123 (1902); Lo Guidice v. Harris, 98 Ohio App. 230, 235, 128 N.E.2d 842 (1954); 6 Williston on Contracts § 1712, p. 4836 (rev. ed. 1938). The Ruffalo decision itself indicates that any inconsistency with the Ohio decisions allowing full recovery by an attorney who is discharged from a contingent fee contract is to be resolved by limiting the earlier decisions. And in any event, the Ruffalo decision clearly establishes that such arrangements are contrary to the public policy of Ohio. We suppose that they are no more contrary to public policy than ordinary champertous transactions, and hence that recovery in quantum meruit may be allowed wherever any services have been performed pursuant to the void contract.

We are of the opinion, however, that further inquiry should be made as to whether arrangements for maintenance of Craig during the pendency of his claim rendered plaintiffs' contract unenforceable.[7]

---

7. Since preparation of this opinion we have received Judge Talbot Smith's opinion. He states that "behind these essentially simple facts lies a pressing social problem, the adjustment of the competing and conflicting interests of an employer, represented by a lay claims adjuster, a member of the bar, and *an injured* employee," and further that "at issue is the entire area of the legal representation of injured employees who seek recompense for their injuries. *At war* are two conflicting interests: *the injured employee*, and his lawyer, seek the maximum recovery. The employer, and his claim agent, seek the minimum." (Emphasis supplied.) We indeed appreciate Judge Smith's sociological development of the pressing social problem which he postulates, but respectfully express our belief that such discussion is irrelevant to the *decision which* we announce. The only question involved in this lawsuit is whether plaintiff attorneys are to get their full contingent fee ($12,500.00) *not out of the $50,000 paid to the employee* Craig, but from the defendant railroad which agreed to protect him against liability to the plaintiff attorneys. The injured employee is not at war with anybody, he makes no claim that he was overreached, and there is nothing in the record to suggest that the $50,000 paid to him was less than adequate considering his injuries and the nondisclosed facts which may or may not have established liability on the part of the railroad. The plaintiffs' demand for the fee of $12,500, indeed, is bottomed upon the settlement being a *fait accompli*. Plaintiffs do claim that the accomplishment of the settlement was a tortious interference with their contract. The manner in which it was done is relevant to that issue, but plaintiffs' complaint makes no claim that the settlement price was unfair to Craig and the District Judge did not consider such an issue.

The judgment of the District Court is vacated and the cause remanded for further proceedings and fact finding in accordance with this opinion. Within the discretion of the District Court, such proceedings may include the taking of additional testimony on the subject which prompts this remand.

TALBOT SMITH, District Judge (partially concurring in result only).

The majority opinion, in my judgment, does not follow the teachings of the recent case of Brotherhood of Railroad Trainmen v. Virginia ex rel. State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). It will tend to perpetuate, if not encourage, those practices condemned in the Brotherhood case and which were at the root of that decision. I thus concur only in the result, i. e., remand, but would broaden the purpose thereof.

The facts are essentially simple: We have an injured railroad employee, an amputee, Mr. Carl Craig, who had retained counsel. One night approximately a month after the injury, a railroad claim agent, Mr. Woodard, accompanied by Craig's boss, Trainmaster Ward, appeared at Mr. Craig's home, uninvited. Mr. Woodard bore with him a portable typewriter and a blank check and proceeded to negotiate a settlement for $50,000, well knowing that Mr. Craig had retained counsel, and knowing also (according to the trier of the facts) that counsel had a contingent fee contract. With the typewriter he prepared (according to the trier of the facts) 2 letters: one to the attorney, promising to be liable for his fees up to 11:30 P.M. that night. This one he signed. The other discharged the attorney and told him to submit a bill for services rendered up to the same hour. This letter Craig signed.

The action before us is against the railroad. Count One sets up, *inter alia*, interference with contract relations, count two a third-party beneficiary contract.

Various defenses are interposed by the railroad, some of which will be examined in due course. But behind these essentially simple facts lies a pressing social problem, the adjustment of the competing and conflicting interests of an employer, represented by a lay claims adjuster, a member of the bar, and an injured employee. This is the problem to which the recent case of Brotherhood of Railroad Trainmen v. Virginia ex rel. State Bar [1] is addressed. I do not think, as I have noted, that the majority opinion follows its teachings.

At issue is the entire area of the legal representation of injured employees who seek recompense for their injuries. At war are two conflicting interests: the injured employee, and his lawyer, seek the maximum recovery. The employer, and his claim agent, seek the minimum. Our problem in the courts is the fair balancing of these two interests. I do not believe it can best be accomplished by the elimination of lawyer, as was here done. The attorney-client relationship is too important to the administration of justice, too important, indeed, to our entire society, where every social and economic issue becomes eventually a legal issue, to sanction, even by indirection, its destruction. The railroad, it is true, does not like the way the relationship was initiated. Its point of view was recently presented to our highest tribunal and rejected. So long as the relationship exists (and it did exist until the night of November 17) it must be viewed by the law with a jealous eye. I think it clear from facts to which I shall later avert that claim agent Woodard negotiated that night not only a settlement but the wanton destruction of this relationship. Such a practice should not be made profitable.

The railroad makes much of the fact that the plaintiff attorney sues for a large sum of money for the destruction of a contract which (up to that point) had had practically no work done towards its successful consummation. This comes

1. 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964).

with ill grace from the very party who prevented performance. But it also involves an attack upon the contingent-fee contract itself since such recompense is inherent in the very nature of the contract. It is true that such a contract presents always the possibility of a large fee to successful counsel. But it presents, as well, certain other aspects which were possibly best expressed by the late Professor Radin of Boalt Hall, University of California, at Berkeley. He wrote, in part,[2]

"All lawyers are rich. They get huge fees. When they are attorneys for a decedent's estate, they take the whole estate. They crack the walnut, give each litigant one of the two half-shells, and eat the kernel themselves. Or else, it is an oyster which they eat, giving the litigants the somewhat less edible valves. All this must be true because laymen have said it about lawyers for many hundred years.

"It must, therefore, be something of a surprise to laymen to discover that lawyers—a great many working lawyers—are willing to work, and work hard, for nothing. Or at any rate for an excellent chance of getting nothing. Not only will they work hard, but they will put themselves to considerable expense which may very well never get repaid. And when laymen discover that the lawyers who do this are assailed by other lawyers for the impropriety of their conduct, they will doubtless be confirmed in their conviction that everything that lawyers do which sounds well-disposed or benevolent to laymen is bitterly opposed by the generality of the profession.

"That, we must remember, is an important and often neglected element in the question of the contingent fee; the contrast between the popular and the professional point of view on the subject. To the laity

the offer of a lawyer to conduct litigation wholly or partly at his own expense and to be paid only if he is successful in obtaining not merely a judgment but an actual recovery, is, in the main, taken to be a laudable and beneficial proposal. Among lawyers, on the other hand, the arrangement for a contingent fee was at one time not only void, but constituted a criminal offense, the offense of champerty. That is still the rule in England. And at the present time, in places where it is not void, it is looked upon with disfavor, not to say with contempt."

On the other hand it is clear that neither we of the profession, nor the public, can tolerate ambulance chasing in any of its aspects, of which more later. Its results are as inimical to the doing of justice in a difficult situation as the activities of a free-wheeling lay claim agent.

The plaintiffs before us, then, assert liability on the part of the railroad due to intentional interference with their contingent fee contract and, in the second count, liability on a third-party beneficiary contract for their benefit.

The tort asserted, the Lumley v. Gye [3] tort, has had broad acceptance (Restatement, Torts § 766, 1939) since its early enunciation and may be very simply stated: A person has the right to be secure in his contractual relationships with others. There is nothing in the attorney-client relationship, exempting it from this salutary principle, nor in the contingent fee contract. There is no need to cite cases to this point. Nor to the point that a client may discharge his attorney at any time, whether he has a contingent fee contract or not, whether their contract says so or not. The relationship permits no other conclusion.

But this is not to say that it may be done scot-free, or that others may interfere with impunity. If the attorney is treated unfairly by the client, the latter

2. Radin, Contingent Fees in California, 28 Calif.L.R. 587 (1940), footnotes omitted.

3. 2 El. and Bl. 216 (Q.B. 1853).

may be liable, just as anyone else who breaks a contract. It was Mr. Justice Holmes who observed that "If you commit a tort, you are liable to pay a compensatory sum. If you commit a contract, you are liable to pay a compensatory sum unless the promised event comes to pass, and that is all the difference." [4]

The Ohio courts are in full accord. As was held in Bolton v. Marshall, 153 Ohio St. 250, 91 N.E.2d 508, 511 (1950):

> "Summarizing, a client has the right to discharge an attorney at any time, with or without cause, subject only to the obligation to compensate the attorney, who is without fault, either on the basis of the reasonable value of the services theretofore rendered or according to an express contract as to compensation if any, between the parties. Where attorney and client have entered into an express contract which covers work to be done or an objective to be accomplished by the attorney and specifies the amount or measure of compensation to be paid therefor, and the client breaches the contract by discharging the attorney or otherwise preventing performance on his part, the attorney may maintain an action on the contract for the breach thereof, and under the rule laid down in the Scheinesohn and Montgomery cases, the measure of recovery is the compensation expressed in the contract. See, also, Goodkind v. Wolkowsky, Adm'r, 132 Fla. 63, 73, 180 So. 538, 543. Compare Wellston Coal Co. v. Franklin Paper Co., 57 Ohio St. 182, 185, 48 N.E. 888, 889."

It is undisputed, then, that the client may discharge the attorney at any time.

But the next step, that since the client may freely terminate, the contract is fair game also for a third party, we cannot take, and this is where the "manner" in which the contract was terminated (referred to by the trial judge in his opinion) comes into prominence. It is well to bear in mind that (and this is addressed to the argument that "there was no breach of contract by Craig") a tort alleged and pleaded and found by the trial court was that of interference with contract relations.[5] This may, of course, and often does arise from inducing a technical breach. But such breach is not necessary. It may arise, as well, from inducing the termination of a contract terminable at will. So far as third persons are concerned, "The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others." Truax v. Raich, 239 U.S. 33, 38, 36 S.Ct. 7, 60 L.Ed. 131 (1915). The Restatement of Torts, § 766, comment (c) (1939) is in point here.[6]

That there was in truth interference with plaintiffs' contract is clear. (Whether it was privileged interference will be examined, infra.) Construing the facts established, as we must, in the light most favorable to sustaining plaintiffs' judgment, this is what it comes to: Before the railroad claim agent Woodard, and Craig's boss Ward, came to Mr. Craig's house on the night of November 17, plaintiff Dombey had a 25% contingent fee contract. When they left, the case had been settled, he had been discharged, and he had been directed to submit a bill, not for his contingent fee (his contract read "suit or settlement") but for "services thus far rendered", namely, up to 11:30 P.M. that night. If this is not interference with an attorney's con-

4. Holmes, Collected Legal Papers, p. 175. See, also, Holmes, The Common Law, p. 297 et seq.; Globe Refining Co. v. Landa Cotton Oil Co., per Holmes, J., 190 U.S. 540, 543, 23 S.Ct. 754, 47 L.Ed. 1171 (1903).

5. " * * * defendant, with notice and knowledge of said agreement between plaintiff and the said Carl K. Craig and without the consent of plaintiff, did nevertheless negotiate with said Carl K. Craig directly concerning said claim and induced him to enter into a settlement agreement with defendant to the exclusion of plaintiff; * * * "

6. See, also, Wilkinson v. Powe, 300 Mich. 275, 1 N.W.2d 539 (1942); the matter is examined in Avins, Inducing the Termination of Contract, 24 Tenn.L.R. 1089 (1957).

tingent fee contract the words will have to be redefined for me.

But, it is argued, this was really all Craig's own doings. The factual conclusion of the trial judge that the letter of discharge was "prepared" by the railroad representatives is sought to be rebutted by the testimony of the claim agent that all he did was to act as amanuensis, that Craig himself was responsible for the language chosen. The claim agent testified: "I typed it [the letter of discharge] after her dictation or their dictation."

The two letters in the record follow in full. The first was concededly prepared by the railroad representatives. It reads as follows:

"General Headquarters
Dearborn, Michigan
November 17, 1960

Mr. and Mrs. Carl K. Craig:

This is to confirm the agreement made between you and the Detroit, Toledo & Ironton Railroad Company, being represented by Wayne Woodard, Ass't Claim Agent. Be it understood upon settlement being made for $50,000.00, we the D. T. & I. Railroad Company will be responsible for any settlement to be made to the law offices of Dombey, Tyler, Richards and Grieser, of the Fifth Floor, 8 East Broad Street, Columbus 15, Ohio, for any fees that is owed to them till 11:30 P.M., November 17, 1960.

Also be it understood that settlement being made at this time we will be responsible for the doctor's fees, artificial leg and physical therapy that will be required by Mr. C. K. Craig, until released by Dr. J. H. Rinehart.

/s/ Wayne A. Woodard

Sworn to before me and subscribed in my presence, this 18th day of November, 1960.

/s/ Elmer P. Schmidt
Notary Public
Notary Public, Clark County, Ohio
My Commission expires Dec. 6, 1961"

The second follows:

"247 Corlington Drive
Springfield, Ohio
November 17, 1960

Dombey, Tyler, Richards and Grieser
Fifth Floor, 8 East Broad Street
Columbus 15, Ohio

Dear Sir:

In confirmation of our telephone conversation as of 11:30 P.M. on November 17, 1960, I have decided to negotiate a settlement with the Detroit, Toledo & Ironton Railroad Company in my own behalf.

This will be a notice that your services are no longer needed. You may issue a bill for services thus far rendered.

Sincerely yours,
/s/ C. K. Craig"

To me (and to the trier of the facts) these letters were prepared by the same hand. Even the terminology employed is the same, commencing with the same expression respecting "confirmation". For comparison of the manner of expression employed by Mr. Craig we note his reply to a question as to whether or not he had resigned his position: "No, I have not signed no resignation * * *". Now, it may well be, of course, that Mrs. Craig is a businesswoman, since dictation by her was suggested by the claim agent. The testimonial hearing for which this case is remanded may clear up this point. If the second letter was in truth simply typed by the railroad representative "after her dictation or their dictation" we have one situation. But if this statement is false we have another, and one that goes to the very heart of the charge of interference charged, as well as the good faith and credibility of the defendant.

There having been, in my judgment, interference with plaintiffs' contract relations the next question presented is whether such interference was privileged. Harper and James [7] well state that the recognition of such a privilege involves a balancing of interests, the social utility of the interest promoted by the privilege as against the social utility of protecting the interests of the injured party to the contract. In short, we must weigh the interests of the railroad in this settlement, this "manner" of settlement if you will, against the attorney-client relationship and the contingent fee situation.

Here we are not without guidance from the highest sources. Behind the Brotherhood of Railroad Trainmen decision [8] (the same Brotherhood as in the matter before this court) was a social evil described by Mr. Justice Black in the following terms:

"The Trainmen and other railroad Brotherhoods were the moving forces that brought about the passage of the Safety Appliance Act in 1893 to make railroad work less dangerous; they also supported passage of the Federal Employers' Liability Act of 1908 to provide for recovery of damages for injured railroad workers and their families by doing away with harsh and technical common-law rules which sometimes made recovery difficult or even impossible. It soon became apparent to the railroad workers, however, that simply having these federal statutes on the books was not enough to assure that the workers would receive the full benefit of the compensatory damages Congress intended they should have. Injured workers or their families often fell prey on the one hand to persuasive claims adjusters eager to gain a quick and cheap settlement for their railroad employers, or on the other to lawyers either not competent to try these lawsuits against the able and experienced railroad counsel or too willing to settle a case for a quick dollar.

It was to protect against these obvious hazards to the injured man or his widow that the workers through their Brotherhood set up their Legal Aid Department, since renamed Department of Legal Counsel, the basic activities of which the court below has enjoined."

That the problem confronted was of national rather than local significance appears also from the case of In re Heirich, 10 Ill.2d 357, 140 N.E.2d 825, 836, 67 A.L.R.2d 827 (1956):

"We further take judicial notice of respondent's exhibit 48, rejected by the commissioners, being a report of the Railroad Retirement Board to the senate committee on Interstate Commerce, which we believe bears directly on this proceeding. That report

---

7. 1 Harper and James, Torts, § 6.12 (1956).

8. Brotherhood of R.R. Trainmen v. Virginia ex rel. State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964).

shows a general course of conduct and a highly antagonistic attitude of the railroads toward all employees who retain counsel to defend their rights; that in Federal employers' liability cases settled without counsel, 97% of the employees returned to work for the railroad; while if suit was filed, from 80% to 96% of such employees lost their jobs. In that connection the witness Woodside admitted, and his mother reiterated, that because he retained respondent "they wouldn't let him railroad any more," and he further stated that Ericksen told him when he first came down to see that the railroads were out to get Heirich, and that he, Ericksen, was down there for the bar association to disbar respondent. This was undenied although Ericksen was constantly present at all the hearings. The report states in part: 'In some cases indeed, the claim agents go much further with implied threats that if suit is filed, the claimant would never be able to work for any big company again, or would receive references so unfavorable as to amount to blacklisting.' The report further states: 'The experience for all cases in which bargaining could be measured in these terms is summarized in table 5. In nonattorney cases bargaining resulted in a settlement which was on the average of 60% to 78% higher than the initial offer. Where an attorney was engaged, the initial bid was on the average more than doubled before the case was closed. In cases where the attorney felt it advisable and persuaded his client to file suit, the gross amount recovered was on the average of three or more times larger than the figures originally named by the claim agent.' "

The paragraph immediately following the above is of interest in the light of the particular facts now before us.

"The testimony of the director of the Railroad Claims Research Bureau indicates that at least one of the railroads adopted the practice of settling with claimants even when they knew that a lawyer was representing the claimant at that time."

My conclusion on this aspect of the case is not only that there was in fact interference with contract relations by defendant, but that the interference was unlawful (i. e., nonprivileged).

A final aspect of the case, peculiar, so far as I have been able to determine, to these particular facts, remains to be examined. It is argued that even if some repudiation of plaintiffs' contract rights could be made out, nevertheless the railroad itself promised to be responsible for any fees owed plaintiffs and hence "how this undertaking can be squared with a finding that defendants interfered with plaintiffs' rights is unclear."

If, then, the defendant railroad did undertake to pay plaintiffs' fees, how does this case arise? It arises because, it is said, the full contingent fee was not legally due to the plaintiffs. Before getting into why it was not due, a threshold question is presented. If one party (here Craig) allegedly owes another (here the plaintiffs) a third party (here the railroad) may, for its own reasons, assume the obligations to the "beneficiary." On the other hand, it may not. It has a free hand in the matter. It has the choice either to enter the picture or stay out of it. If it chooses to enter, may it thereafter deny the validity of the original obligation?

The cases indicate that it depends upon the factual interpretation of the third-party contract. If the agreement is general, e. g., to pay all of another's debts, it is within the competence of the promisor to establish that a certain alleged debt was not in truth owing. But if the agreement is to pay a specific debt it does not lie in the mouth of the promisor when later called upon to make good on his promise, to go back and to dispute the existence of the original debt. His promisee assumed that obligation for him and he, the promisor, could take it or leave it

as he saw fit. Such is my understanding of the law of contracts and I find nothing in the Ohio Law contrary thereto.

"Unless the case is within the rules making contracts voidable for mutual mistake, where performance of a promise in a contract will benefit a person other than the promisee, the promisor's duty is not avoided or limited by an erroneous belief of the promisor or of the promisee as to the existence or extent of a duty of the promisee to the beneficiary." Restatement of Contracts, § 144.

In this respect it is argued that the railroad did not know that the contract was based on a contingent fee. The trial court found otherwise, and I would agree.[9] However, I do not feel that the point is critical. The defendant at the very least, knew there was a contract before it settled and if it chose not to inquire as to its terms I would hold that it could not now complain that it was ignorant of the terms thereof. A man can buy a pig in a poke if he wants to and if he chooses not to look inside the poke that is his affair. However, as I said, I think the trial court came to a sustainable conclusion on this factual issue.

All of the above, however, both as to tort and contract, is subject to an overriding consideration: If a transaction is void as being contrary to law or public policy, then the law will leave the parties where they have placed themselves.

This brings us to the disposition of the case. It started as an out-and-out test of what the railroad regarded as ambulance chasing. In Paragraph 4 of the Complaint the plaintiffs had set out their contract in the following terms:

"4. On or about November 14, 1960 plaintiff through its partners entered into an agreement with Carl K. Craig, whereunder the said Carl K. Craig retained the plaintiff as his attorney and gave to said attorneys the exclusive right to prosecute his claim for damages against the defendant railroad corporation for injuries sustained by him on October 10, 1960, while he was employed by defendant. Said agreement further provided that the said attorneys in consideration of services rendered should receive 25 per cent of whatever sum should be recovered through suit or settlement."

Defendant's answer set up the defense above referred to:

SECOND DEFENSE

"For its second defense to the Complaint herein, the defendant, Detroit, Toledo and Ironton Railroad Company, states that any agreement of the type referred to in paragraph 4 of the Complaint entered into between the plaintiff and Carl Craig was champertous, contrary to public policy, was not the voluntary and free act of the aforesaid Carl Craig and was illegal, unenforceable and void."

On this issue the trial court held as follows:

"And finally, the defendant has argued that the contract between plaintiff and Craig is void because of the activities of the Brotherhood of Railroad Trainmen in arranging or promoting the contract for an attorney to represent one of their members and because of a violation of the code of legal ethics by the attorneys in this case. This argument is not well taken because the Court has

---

9. Cross-Examination of Attorney Richards (796), conversation with Craig.
   A. No. My purpose in going over was not to present him with any [70] bill. The bill was established. It was 25 per cent, as I think he knew.
   And I discussed with him that we had the 25 per cent contract which he ac-

knowledged, of course, again, signing and that the Company knew about it, it had been shown to them. And because it was he felt a valid contract was why he was so concerned with getting a signed commitment from them that they would take care of the obligations under that contract.

found the contract in question to have been entered into voluntarily and as the free act of the parties. The matters raised by defendant should, if defendant believes them to have merit, be presented to the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio for its consideration."

This holding, it might be noted, filed on January 15, 1964, antedated by some three months the opinion of the Supreme Court in Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 960, 84 S.Ct. 1113, 1625, 12 L.Ed.2d 89, 505 (1964) in which the Brotherhood's plan of legal representation was examined and ruled upon.

In our court, in its reply brief (the original brief apparently having been prepared before the Trainmen decision was announced) the railroad still urged that plaintiff's conduct had been unethical, seeking to distinguish Trainmen on the ground that that case sanctioned only the recommendation of counsel, whereas the case before us involved "vigorous, concerted *solicitation* of law business by an intermediary organization." (Italics in original.) It is my opinion that the distinction between the cases is not well taken.

There remain, however, two other matters in the record deserving our at-tention. The first, discussed in more detail in Judge O'Sullivan's opinion, has to do with the possibility of champerty by maintenance of Mr. Craig without arrangement for repayment in event of no recovery. I agree that, although not squarely presented either to the trial court or to us, the matter should be explored, as a matter of public policy, because of its gravity.

The other point suggested in the record likewise not squarely presented either below or to us, relates to the suggestion that Craig's settlement was unfair to him.[10]

Here we confront another public policy issue and it differs from the champerty issue in that it need not involve the legal profession at all. It primarily concerns the citizens at large, all those who in one way or another run foul of the machinery of our industrial economy. It is this: Was Craig overreached by the claim agent? He was actually unrepresented by counsel when he accepted the railroad's (his employer's) tendered sum. His retained counsel thought the figure was foolish. His boss, though unconnected with the railroad's claim department, was with the claim agent at the time of settlement and there was talk then and later about maybe a job might be found for him, despite his amputation.[11]

I would thus broaden the public policy issue upon remand to include not only the

---

10. Attorney Dombey: "I told him (Craig) I would not advise him to do it, but I couldn't stand in his way of settling the case for $10,000 if that's what he wanted to do."

Craig: "He [Dombey] said he thought I was a damned fool for accepting what I did."

11. Redirect Testimony of Carl Craig [R. 306]

Q Do you know if you still hold your seniority on the roster of the Railroad Company?

A I believe concerning any accident, an Interstate Commerce case, I cannot go back as a trainman with a limb off.

I would automatically be off of the roster with this type of injury.

Q I understand, however, that your statement was that you did not sign a resignation from the service?

A No. I have not signed no resignation or have been asked to sign any sort of a resignation that my employment has terminated with the Company.

Q Have you even been offered return to duty for the Company?

A The only offer that was made, I made, myself. I asked Mr. [82] Van Huss the day that I made the statement to the Company on the tape recording, he said, "Any more questions?" And I said, kind of jokingly, "When do I go to work?" And Mr. Van Huss said

actions and representations of Craig's attorneys, but also those of the railroad's claim agent, and Trainmaster Ward. If the injured workman has in fact been overreached we have an action by the railroad, his employer, in the same moral area as cheating or fraud, with the same bearing upon its credibility and good faith. Moreover, without anticipating the results of such inquiry, if, indeed, Craig was overreached (as to which I express no conclusion whatever) the statement of the American Bar Association in its Amicus Curiae brief in the Brotherhood v. Virginia case, supra, suggests a possible remedy, namely, that (p. 20) " * * * if the railroad's lay claim agents improperly seek to pressure injured men into fast settlements, the union men can be warned to take care and file complaints in the event of such overreaching." [12]

I would remand for further proceeding in accordance with this opinion.

to come and see him when I was ready to go to work.

Q That was when you gave the taped statement?

A That's right.

Q Have you since gone to see him?

A I have not seen Mr. Van Huss but I have been talking to Mr. Ward who was my boss here in Springfield, the Trainmaster, and I have asked him certain times if there was anything said about my return to work and he told me that when I am ready to go to work that I would be considered for a job.

12. This is written in response to footnote 7 of the majority opinion, addressed to the dissenting opinion.

There should be no misunderstanding on this point. I agree with Judge O'Sullivan that Mr. Craig is completely quiet, not complaining about anything. That is precisely why the dissenting opinion was written.

It requires no Supreme Court opinion to tell us (though the Brotherhood case, supra, at p. 7, 84 S.Ct. at p. 1117 is specific to the point) that "Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counselled adversaries." The problems of laymen respecting their rights were "postulated" by our industrial economy before any Judge now writing was alive. They will not go away even though they be dubbed "sociological" and not for us practical lawyers. With, likewise, much respect, I submit that such considerations are in law and in fact as relevant to this case as they were to the Brotherhood case, supra, where they formed the basis for the opinion.

The tragedy is that unless our vision extends beyond our bench the flight from the courts to the lay agents and agencies will accelerate, and, conceivably, with justification. It will be recalled that the grotesque results of a trilogy of legal doctrines (the fellow servant rule, assumption of risk, and contributory negligence), applied formalistically and in utter disregard of the problems created by the industrial age, took the bulk of the cases of injured workmen out of the courts several years ago. For those believing with me, that the complaints of our people are best heard and, if existing, remedied by common law courts and not by legislative "tribunals" the result is to be deplored.

Similarly here.