**In re O'NEILL.**
No. C-3046.

District Court, E. D. New York.
Dec. 26, 1933.

John Winans, of New York City, for Alfred T. Rowe, petitioner.

Richard Campbell, of New York City, for respondent.

Tom J. McGrath, of Cleveland, Ohio, Gen. Counsel, Brotherhood of Railroad Trainmen, amicus curiæ.

Before CAMPBELL, INCH, MOSCO-WITZ, GALSTON, and BYERS, District Judges.

## PER CURIAM.

This proceeding had its origin in the motion for substitution of the respondent as attorney of record in the place of one Rowe, referred to in the matter reported in Re Rowe (D. C.) 4 F.Supp. 35.

The substitution was the result of the efforts of one James H. Murman, representing the Brotherhood of Railroad Trainmen, to induce the plaintiff in an accident suit to retain this respondent in place of Rowe as his attorney. The practice prevailing in such matters, where a member of the Brotherhood had suffered injuries, was necessarily brought to light, and the facts are substantially undisputed as to the methods involved. That is to say, the organization sought to serve its members so injured, and the families of those who were killed, by placing at their disposal the professional services of lawyers known to be skilled in that branch of their calling, to the end that settlements might be made and thus litigation avoided wherever the seniority of railway employees might be preserved without sacrifice of fair compensation for established cause.

If that should prove to be inexpedient, it was the concern of the Brotherhood to see to it that lawsuits should be conducted by experienced attorneys, whose charges would be restricted to somewhat less than the usual percentage of contingent fees in such cases. That result was attained by dividing the territory represented by the union membership into zones or regions, and, as to each, one lawyer was selected or designated by the organization, known as the regional counsel, and his employment was urged or strongly recommended to each injured member, or bereaved family.

This respondent was the regional counsel for the New York Harbor area, and he was so selected by action of the accredited officers or committee of the Brotherhood.

As to so much of the union's activity, this court is prepared to believe that the organization was performing a valuable service to its members.

The status thus acquired by the respondent provided a certain volume of regular employment, and, as a consequence, he could afford to take these cases at a smaller percentage of contingent fee than the prevailing rate among other lawyers skilled in negligence litigation, or than would be the case if his employment were of a desultory character.

The plan was carried into effect by the use of a written contract of retainer, which provided for a contingent fee of 20 per cent., one-quarter of which the respondent agreed to pay to the Brotherhood (i. e., its general counsel in Cleveland, Ohio) to be applied to the maintenance of the Legal Aid Bureau of the organization. The latter was the department of the union under which the "investigators" functioned. This man, James H. Murman, was the investigator for the region in which the respondent was regional counsel.

One example of his activity is shown, as has been stated, in the matter which is responsible for this proceeding.

The question is thus presented of whether this contract of retainer offends the rules of this court.

The respondent became a member of this bar on September 9, 1931, and, as our rules require, he expressly undertook to abide by the Canons of Ethics of the New York State Bar Association. Rule 3 clearly states that unprofessional conduct requiring discipline shall include a failure to abide by those Canons. Canon 28, so far as applicable, reads as follows:

"28. Stirring up Litigation, Directly or Through Agents.—

" * * * It is disreputable * * * to breed litigation by seeking out those * * * having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, * * * or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the * * * sick and the injured, the ignorant or others, to seek his professional services."

We entertain no doubt that the foregoing applies to the contract whereby this respondent turned over one-quarter of his fees to the Brotherhood. The helpful nature of the efforts of the latter to secure the maximum of

results for or on behalf of its injured members, through the medium herein described, may be freely conceded, without in the least obscuring the issue. This respondent undertook to govern his professional relations according to the requirement quoted, and it would be but a poor tribute to his intelligence to suggest that his contribution of a quarter of his fees, to an organization through whose auspices clients were brought to him, constituted other than a plain and deliberate departure from that undertaking.

During the progress of this proceeding, the contractual relations between the respondent, his client and the Brotherhood were somewhat altered in form—as the result of an intimation judicially imparted at preliminary hearing—so that now the respondent procures two contracts, one to secure his 15 per cent. contingent fee, and the other whereby the client employs the Legal Aid Department of the Brotherhood "to investigate my claim against ———, and to assist in the prosecution and compromise of legal proceedings in my behalf against the proper defendant, to recover damages for injuries * * * and I do hereby agree with the said Legal Aid Department to pay it, in accordance with its plan, five per cent. (5%) of the net settlement, verdict or recovery had in said action."

We can see no difference in principle between the use of two contracts and one, where the purpose is to secure for the Brotherhood one-quarter of the contingent fee as a contribution to the Legal Aid Department of which the investigator is a representative.

The union has the right to arrange with its members for the support of that department, but the respondent's professional relations with his clients should be completely and entirely dissociated from that activity, directly or indirectly. The necessity for such independence of function is clearly set forth in Canon 35, as follows:

"35. Intermediaries.—The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries.

"A lawyer may accept employment from any organization, such as an association, club or trade organization, to render legal services in any matter in which the organization, as an entity, is interested, but this employment should not include the rendering of legal services to the members of such an organization in respect to their individual affairs.

"The established custom of receiving commercial collections through a lay agency is not condemned hereby."

The respondent somewhat justifies the practice in question because of what was written in the case of Ryan v. The Pennsylvania Railroad Co., No. 35905 in the superior court of Cook county, Ill., in an action in which a regional attorney for this Brotherhood sought to assert a lien for professional services, based upon the same kind of contract herein discussed, where the railroad company had secretly settled with the client, when an action was about to be reached for trial. The railroad company contended that the retainer embodied an illegal contract, and sought thus to avoid recovery. The court upheld the contract for the purpose of the attorney's lien, and awarded 20 per cent. of the amount of the settlement.

The basis of decision was that the contract was not contrary to public policy, and that the Brotherhood was engaged in rendering an enlightened service to its members from which the one in question had greatly benefited.

That is not the question upon which this court must pass, which has to do only with the infraction of its rules. For all that is shown by the opinion referred to, the superior court of Cook county, Ill., may not require adherence to the Canons of Ethics of the American and New York State Bar Associations, which after due consideration have been adopted as embodying the professional standards required to be maintained by the bar of this court.

It is our conclusion that the respondent's unprofessional conduct as indicated has been clearly established, and invites the censure of the court, which is hereby recorded.

As to all of respondent's cases on the calendar of this court, in which he was retained under such contracts as are herein discussed, he will not be permitted to proceed until he demonstrates, by his affidavit filed in each such cause, that the contract has been rescinded, and that he has been retained under a new agreement as to which there is no interest, express or implied, direct or indirect, upon his part or that of any associate of his, in the payment by his client of any sum to the Brotherhood of Railroad Trainmen or any of its departments, bureaus, agents, or employ-

ees for any purpose whatever; and, as to any payment so to be made, he has taken no part, directly or indirectly, in causing an agreement or undertaking in that behalf to be entered into.

The court will enter an order embodying the foregoing ten days from this date.