377 U.S. 1 (1964)
BROTHERHOOD OF RAILROAD TRAINMEN
v.
VIRGINIA EX REL. VIRGINIA STATE BAR.
No. 34.
Supreme Court of United States.
Argued January 13, 1964.
Decided April 20, 1964.
CERTIORARI TO THE SUPREME COURT OF APPEALS OF VIRGINIA.
Beecher E. Stallard and John J. Naughton argued the cause for petitioner. With them on the briefs were Edward B. Henslee and Arnold Elkind.
Aubrey R. Bowles, Jr. argued the cause for respondent. With him on the brief was Aubrey R. Bowles III.
Wayland B. Cedarquist, Holcombe H. Perry, Warren H. Resh and Earl Sneed filed a brief for the American Bar Association, as amicus curiae, urging affirmance.
MR. JUSTICE BLACK delivered the opinion of the Court.
The Virginia State Bar brought this suit in the Chancery Court of the City of Richmond, Virginia, *2 against the Brotherhood of Railroad Trainmen, an investigator employed by the Brotherhood, and an attorney designated its "Regional Counsel," to enjoin them from carrying on activities which, the Bar charged, constituted the solicitation of legal business and the unauthorized practice of law in Virginia.[1] It was conceded that in order to assist the prosecution of claims by injured railroad workers or by the families of workers killed on the job the Brotherhood maintains in Virginia and throughout the country a Department of Legal Counsel which recommends to Brotherhood members and their families the names of lawyers whom the Brotherhood believes to be honest and competent. Finding that the Brotherhood's plan resulted in "channeling all, or substantially all," the workers' claims to lawyers chosen by the Department of Legal Counsel, the court issued an injunction against the Brotherhood's carrying out its plan in Virginia. The Supreme Court of Appeals of Virginia affirmed summarily over objections that the injunction abridges the Brotherhood's rights under the First and Fourteenth Amendments, which guarantee freedom of speech, petition and assembly. We granted certiorari to consider this constitutional question in the light of our recent decision in NAACP v. Button, 371 U. S. 415.[2] 372 U. S. 905.
The Brotherhood's plan is not a new one. Its roots go back to 1883, when the Brotherhood was founded as a fraternal and mutual benefit society to promote the welfare of the trainmen and "to protect their families by the exercise of benevolence, very needful in a calling so *3 hazardous as ours . . . ."[3] Railroad work at that time was indeed dangerous. In 1888 the odds against a railroad brakeman's dying a natural death were almost four to one;[4] the average life expectancy of a switchman in 1893 was seven years.[5] It was quite natural, therefore, that railroad workers combined their strength and efforts in the Brotherhood in order to provide insurance and financial assistance to sick and injured members and to seek safer working conditions. The Trainmen and other railroad Brotherhoods were the moving forces that brought about the passage of the Safety Appliance Act[6] in 1893 to make railroad work less dangerous; they also supported passage of the Federal Employers' Liability Act[7] of 1908 to provide for recovery of damages for injured railroad workers and their families by doing away with harsh and technical common-law rules which sometimes made recovery difficult or even impossible. It soon became apparent to the railroad workers, however, that simply having these federal statutes on the books was not enough to assure that the workers would receive the full benefit of the compensatory damages Congress intended they should have. Injured workers or their families often fell prey on the one hand to persuasive claims adjusters eager to gain a quick and cheap settlement *4 for their railroad employers, or on the other to lawyers either not competent to try these lawsuits against the able and experienced railroad counsel or too willing to settle a case for a quick dollar.
It was to protect against these obvious hazards to the injured man or his widow that the workers through their Brotherhood set up their Legal Aid Department, since renamed Department of Legal Counsel, the basic activities of which the court below has enjoined. Under their plan the United States was divided into sixteen regions and the Brotherhood selected, on the advice of local lawyers and federal and state judges, a lawyer or firm in each region with a reputation for honesty and skill in representing plaintiffs in railroad personal injury litigation. When a worker was injured or killed, the secretary of his local lodge would go to him or to his widow or children and recommend that the claim not be settled without first seeing a lawyer, and that in the Brotherhood's judgment the best lawyer to consult was the counsel selected by it for that area.[8]
There is a dispute between the parties as to the exact meaning of the decree rendered below, but the Brotherhood in this Court objects specifically to the provisions which enjoin it
". . . from holding out lawyers selected by it as the only approved lawyers to aid the members or their families; . . . or in any other manner soliciting or encouraging such legal employment of the selected lawyers; . . . and from doing any act or combination of acts, and from formulating and putting into practice any plan, pattern or design, the *5 result of which is to channel legal employment to any particular lawyer or group of lawyers . . . ."[9]
The Brotherhood admits that it advises injured members and their dependents to obtain legal advice before making settlement of their claims and that it recommends particular attorneys to handle such claims. The result of the plan, the Brotherhood admits, is to channel legal employment to the particular lawyers approved by the Brotherhood as legally and morally competent to handle injury claims for members and their families. It is the injunction against this particular practice which the Brotherhood, on behalf of its members, contends denies them rights guaranteed by the First and Fourteenth Amendments. We agree with this contention.
It cannot be seriously doubted that the First Amendment's guarantees of free speech, petition and assembly give railroad workers the right to gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them in the Safety Appliance Act and the Federal Employers' Liability Act, statutory rights which would be vain and futile if the workers could not talk together freely as to the best *6 course to follow. The right of members to consult with each other in a fraternal organization necessarily includes the right to select a spokesman from their number who could be expected to give the wisest counsel. That is the role played by the members who carry out the legal aid program. And the right of the workers personally or through a special department of their Brotherhood to advise concerning the need for legal assistanceand, most importantly, what lawyer a member could confidently rely onis an inseparable part of this constitutionally guaranteed right to assist and advise each other.
Virginia undoubtedly has broad powers to regulate the practice of law within its borders;[10] but we have had occasion in the past to recognize that in regulating the practice of law a State cannot ignore the rights of individuals secured by the Constitution.[11] For as we said in NAACP v. Button, supra, 371 U. S., at 429, "a State cannot foreclose the exercise of constitutional rights by mere labels." Here what Virginia has sought to halt is not a commercialization of the legal profession which might threaten the moral and ethical fabric of the administration of justice. It is not "ambulance chasing." The railroad workers, by recommending competent lawyers to each other, obviously are not themselves engaging in the practice of law, nor are they or the lawyers whom *7 they select parties to any soliciting of business. It is interesting to note that in Great Britain unions do not simply recommend lawyers to members in need of advice; they retain counsel, paid by the union, to represent members in personal lawsuits,[12] a practice similar to that which we upheld in NAACP v. Button, supra.
A State could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest. Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries, cf. Gideon v. Wainwright, 372 U. S. 335, and for them to associate together to help one another to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics.[13] The State can no more keep these workers from using their cooperative plan to advise one another than it could use more direct means to bar them from resorting to the courts to vindicate their legal rights. The right to petition the courts cannot be so handicapped.
Only last Term we had occasion to consider an earlier attempt by Virginia to enjoin the National Association for the Advancement of Colored People from advising prospective litigants to seek the assistance of particular attorneys. In fact, in that case, unlike this one, the attorneys were actually employed by the association which recommended them, and recommendations were made even to nonmembers. NAACP v. Button, supra. We held that "although the petitioner has amply shown that its activities fall within the First Amendment's *8 protections, the State has failed to advance any substantial regulatory interest, in the form of substantive evils flowing from petitioner's activities, which can justify the broad prohibitions which it has imposed." 371 U. S., at 444.[14] In the present case the State again has failed to show any appreciable public interest in preventing the Brotherhood from carrying out its plan to recommend the lawyers it selects to represent injured workers. The Brotherhood's activities fall just as clearly within the protection of the First Amendment. And the Constitution protects the associational rights of the members of the union precisely as it does those of the NAACP.
We hold that the First and Fourteenth Amendments protect the right of the members through their Brotherhood to maintain and carry out their plan for advising workers who are injured to obtain legal advice and for recommending specific lawyers. Since the part of the decree to which the Brotherhood objects infringes those rights, it cannot stand; and to the extent any other part of the decree forbids these activities it too must fall. And, of course, lawyers accepting employment under this constitutionally protected plan have a like protection which the State cannot abridge.
The judgment and decree are vacated and the case is remanded for proceedings not inconsistent with this opinion.
It is so ordered.
MR. JUSTICE STEWART took no part in the disposition of this case.
*9 MR. JUSTICE CLARK, whom MR. JUSTICE HARLAN joins, dissenting.
By its decision today the Court overthrows state regulation of the legal profession and relegates the practice of law to the level of a commercial enterprise. The Court permits a labor unioncontrary to state lawto engage in the unauthorized practice of soliciting personal injury cases from among its membership on behalf of 16 regional attorneys whom its president has placed on the union's approved list. Local officials of the union call on each member suffering an injury and seek to secure employment of these approved attorneys in the prosecution of claims for damages arising therefrom. Moreover the union, through its president, not only controls the appointment and dismissal of the approved attorney but also has considerable influence over his fees and often controls the disposition of cases. Furthermore, from 1930 to at least 1959, the union had required these approved attorneys to pay to it a portion of their fees, usually 25%. Such an arrangement may even now be in effect through the ruse of reimbursement for investigatory services rendered by the union. This state of affairs degrades the profession, proselytes the approved attorneys to certain required attitudes and contravenes both the accepted ethics of the profession and the statutory and judicial rules of acceptable conduct.
The Court excuses the practice on the policy ground that the union membership needs a corps of attorneys experienced in personal injury litigation because ordinary "lawyers [are] either not competent to try these lawsuits against the able and experienced railroad counsel or too willing to settle a case for a quick dollar." To me this is a serious indictment of the profession. In the cases that I have passed on herenumbering about 177 during the past 15 yearsI dare say that counsel for the railroad employee has exhibited advocacy not inferior to that of *10 his opponent (although I do not remember that any one of the 16 approved attorneys appeared in these cases). Indeed, the railroad employee has prevailed in practically all of the cases and the recoveries have ranged as high as $625,000. See Gallick v. Baltimore & Ohio R. Co., 372 U. S. 108 (1963); Transcript of Record, p. 7. Under these facts the Court's rationale will not stand up, even as a policy ground for approving this patent violation of the cardinal ethics of our profession and flagrant disobedience to the law of most of our States.
The Court depends upon NAACP v. Button, 371 U. S. 415 (1963), to support its position. But there the vital fact was that the claimed privilege was a "form of political expression" to secure, through court action, constitutionally protected civil rights.[1] Personal injury litigation is not a form of political expression, but rather a procedure for the settlement of damage claims. No guaranteed civil right is involved. Here, the question involves solely the regulation of the profession, a power long recognized as belonging peculiarly to the State. Button, as well as its ancestry cited by the majority in the footnotes, is not apposite.
Finally, no substantive evil would result from the activity permitted in Button. But here the past history of the union indicates the contrary. Its Legal Aid Department (now the Department of Legal Counsel) was set up in 1930 for the admitted purposes of advising members "relative to their rights respecting claims for damages" and assisting them "in negotiating settlements . . . ." The Department had a complete reporting service on all major *11 injuries or deaths suffered by its members, regional investigators to whom such reports were referred, and the 16 approved regional counsel (many of whom remain the same today) to whom the cases were channeled for prosecution and who split their fees with the union. And, what is of even more significance, the trial court in this case found "that the defendant Brotherhood still adheres to the pattern and design of the plan formulated and implemented in 1930."
The union admits that it did operate in this manner until 1959 but says that it has now reformed its operation. But the record shows that this identical union plan has been before several other courts[2] and, while the union has repeatedly promised to reform, as here, it has consistently renewed the same practices. But even if the union has sincerely reformed, which I doubt, the plan it now proposes to follow is subject to the same deficiencies. It includes: the approval of 16 regional attorneys by the president of the union, who also has power to discharge them at his pleasure; the solicitation of all injured members by the local officials of the Brotherhood who urge the employment of an approved counsel; the furnishing of the name of the approved counsel to the injured brother as the only attorney approved by the Brotherhood; the furnishing of the names and addresses of injured members to the approved attorneys; the furnishing of investigative services to the approved attorney, the cost of which, it is indicated, comes from the fees received by the latter; and, finally, the "tooting" of the approved attorneys in union literature and meetings.
*12 I do not read the decree approved by the State as prohibiting union members from recommending an attorney to their brothers in the union. Virginia has sought only to halt the gross abuses of channeling and soliciting litigation which have been going on here for 30 years. The potential for evil in the union's system is enormous and, in my view, will bring disrepute to the legal profession. The system must also work to the disadvantage of the Brotherhood members by directing their claims into the hands of the 16 approved attorneys who are subject to the control of one man, the president of the union. Finally, it will encourage further departures from the high standards set by canons of ethics as well as by state regulatory procedures and will be a green light to other groups who for years have attempted to engage in similar practices. E. g., Chicago Bar Assn. v. Chicago Motor Club, 362 Ill. 50, 199 N. E. 1; Rhode Island Bar Assn. v. Automobile Service Assn., 55 R. I. 122, 179 A. 139; cf. Semler v. Oregon State Board of Dental Examiners, 294 U. S. 608 (1935); Williamson v. Lee Optical of Oklahoma, Inc., 348 U. S. 483 (1955).
NOTES
[1] The investigator and the Regional Counsel were not served with process and are not parties.
[2] We do not find it necessary to consider the Brotherhood's additional argument that the decree violates the Brotherhood's right to represent workers which is guaranteed by the Railway Labor Act, 44 Stat. 577, as amended, 45 U. S. C. §§ 151-188.
[3] Constitution of the Brotherhood of Railroad Trainmen and Brotherhood of Railroad Trainmen Insurance Department, Preamble.
[4] Interstate Commerce Commission, Third Annual Report (1889), 85.
[5] Griffith, "The Vindication of a National Public Policy Under the Federal Employers' Liability Act," 18 Law and Contemp. Prob. 160, 163.
[6] 27 Stat. 531, as amended, 45 U. S. C. §§ 1-43.
[7] 35 Stat. 65, as amended, 45 U. S. C. §§ 51-60. An earlier version of the law passed two years earlier, 34 Stat. 232, had been held unconstitutional. Employers' Liability Cases, 207 U. S. 463. The constitutionality of the 1908 statute was sustained in the Second Employers' Liability Cases, 223 U. S. 1.
[8] The Brotherhood also provides a staff, now at its own expense, to investigate accidents to help gather evidence for use by the injured worker or his family should a trial be necessary to vindicate their rights.
[9] Certain other provisions of the decree enjoin the Brotherhood from sharing counsel fees with lawyers whom it recommended and from countenancing the sharing of fees by its regional investigators. The Brotherhood denies that it has engaged in such practices since 1959, in compliance with a decree of the Supreme Court of Illinois. See In re Brotherhood of Railroad Trainmen, 13 Ill. 2d 391, 150 N. E. 2d 163. Since the Brotherhood is not objecting to the other provisions of the decree except insofar as they might later be construed as barring the Brotherhood from helping injured workers or their families by recommending that they not settle without a lawyer and by recommending certain lawyers selected by the Brotherhood, it is only to that extent that we pass upon the validity of the other provisions. Because of our disposition of the case, we do not consider the Brotherhood's claim that the findings of the court were not supported by substantial evidence.
[10] The Bar relies on the common law, the Canons of Ethics of the American Bar Association, adopted into the rules of the Supreme Court of Appeals of Virginia, 171 Va. xviii, and several Virginia statutes prohibiting the unauthorized practice of law. The Canons of Ethics to which the Bar refers prohibit respectively stirring up of litigation, control or exploitation by a lay agency of professional services of a lawyer, and aiding the unauthorized practice of law. Canons 28, 35, 47. The statutes respectively set the qualifications for the practice of law in the State and provide for injunctions against "running, capping, soliciting and maintenance." Virginia Code, 1950, §§ 54-42, 54-83.1.
[11] NAACP v. Button, 371 U. S. 415; Konigsberg v. State Bar, 353 U. S. 252; Schware v. Board of Bar Examiners, 353 U. S. 232.
[12] See Feather, The Essence of Trade Unionism (London, 1963), 42-43.
[13] Cf. Drinker, Legal Ethics (1953), 167; Hildebrand v. State Bar, 36 Cal. 2d 504, 515, 225 P. 2d 508, 514 (Carter, J., dissenting), 36 Cal. 2d, at 521, 225 P. 2d, at 518 (Traynor, J., dissenting).
[14] See also Gibson v. Florida Legislative Investigation Comm., 372 U. S. 539; Louisiana ex rel. Gremillion v. NAACP, 366 U. S. 293; Shelton v. Tucker, 364 U. S. 479; Bates v. City of Little Rock, 361 U. S. 516; NAACP v. Alabama ex rel. Patterson, 357 U. S. 449; Schneider v. State, 308 U. S. 147.
[1] "In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression." NAACP v. Button, supra, at 429.
[2] E. g., In re Petition of Committee on Rule 28 of the Cleveland Bar Assn., 15 Ohio L. Abs. 106 (1933); In re Brotherhood of Railroad Trainmen, 13 Ill. 2d 391, 150 N. E. 2d 163 (1958); In re O'Neill, 5 F. Supp. 465 (E. D. N. Y. 1933); Young v. Gulf M. & O. R. Co., No. 3957 (E. D. Mo. 1946); Reynolds v. Gulf M. O. & Texas Pac. R. Co., No. 772 (E. D. Tenn. 1946); North Carolina ex rel. McLean v. Hice, Superior Ct. of N. C., County of Buncombe (1948).