Peter **BUTLER** and Charles Culhane,
Plaintiffs,

v.

Peter **PREISER**, Commissioner of Correctional Services, and Leon Vincent, Superintendent of Green Haven Correctional Facility, Defendants.

No. 73 Civ. 2691.

United States District Court,
S. D. New York.

June 14, 1974.

Herman Schwartz, Edward I. Koren, Amherst, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for defendants; Hillel Hoffman, Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

In the wake of the "tragic experience of Attica,"[1] a prison uprising that left 11 guards and 32 inmates dead as well as over 80 people wounded,[2] some 65 inmates have been indicted (with more quite possibly to be added) for serious crimes, including murder. A number of inmates and ex-inmates named in the indictments, together with others not named but choosing to participate, undertook to create a fund for the payment of defense costs, including travel for out-of-state attorneys desired as defense counsel, investigative expenses, and other expenditures deemed useful for effective representation. Solicitations for these purposes began at least as early as October 1972. In December 1972, a group of inmates, with the assistance of counsel and leadership participation by New York State Assemblyman Arthur O. Eve, formed the Attica Brothers Defense Fund ("ABDF")[3] to collect funds for the foregoing purposes, to coordinate defense measures, to raise bail money, and to promote prison reform generally.[4]

While ABDF solicitations and pledges went on uneventfully for a while, with

1. Goodwin v. Oswald, 462 F.2d 1237, 1245 (2d Cir. 1972) (Oakes, J., concurring).

2. See Attica—The Official Report of the New York State Special Commission on Attica 496 et seq. (1972).

3. The ABDF has gone through changes of name and organization. These have not seemed important for present purposes to either counsel or the court.

4. Defense costs have consumed most of the receipts thus far. Only about five percent of the Fund's income has been available for bail and about three percent for prison reform activities.

the knowledge and acquiescence of prison wardens and other correctional officials, the effort was blocked in February 1973 by the State Commissioner of Correctional Services.[5] The prohibition was justified as flowing from the Department's "present rules prohibiting transfer of money from one inmate's account to another." This in turn was explained on the grounds of "troubles we encountered in the past"—specifically, "[i]nstances of coercion by one inmate upon another to transfer money without his initiation nor [sic] his own free volition * * * *."

■ This action to enjoin the prohibition was brought under 42 U.S.C. § 1983 on behalf of two classes of inmates —those indicted and others not indicted, but all desiring for their several reasons to solicit for and/or contribute to the ABDF. The court's jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343(3) and (4), and 2201. The court has jurisdiction. The case may proceed as a class action.[6] The court concludes, upon facts and reasons outlined more fully below, that plaintiffs must prevail because the prohibition in issue is an arbitrary and excessive intrusion upon rights protected by the Constitution of the United States. The suppression defendants have effected of rights of association and effective access to the courts denies the due process of law and the equal protection of the laws guaranteed by the Fourteenth Amendment. There were

and are no applicable "rules" to justify this action. There were no "troubles" to account for the nonexistent rules. There have been no "instances of coercion" such as were reported by way of justification. Rather, in a fearful and hostile reaction against efforts at lawful resort to adversary judicial process, defendants made a hastily fashioned prohibition which has not been validated by the course of shifting explanations they have offered to support it here.[7]

## I.

For many years New York prison inmates have been solicited to join and support financially a variety of organizations and causes. The solicitations have sometimes been by prison guards and officers, more often by fellow inmates. Among the organizations involved have been the National Association for the Advancement of Colored People, the Junior Chamber of Commerce, the American Civil Liberties Union, the Black Muslims, the Black Panthers, a union of prisoners, and drives to fight sickle cell anemia, as well as officer-sponsored collections to help flood victims and to send flowers for the funeral of a guard's wife. Solicitations have been conducted by use of bulletin boards, by sheets passed through cell blocks, and by personal approaches in prison yards. Activities of this nature have been conducted openly and with some frequency. Wardens and those un-

---

5. The Commissioner then in office was the predecessor of the defendant Commissioner in this case. The latter has adopted and reaffirmed the prohibition, though on grounds not necessarily the same as those originally stated and not necessarily constant from month to month in the course of this lawsuit. See *infra*.

6. All seem agreed that the class action determination, seemingly proper under Fed.R. Civ.P. 23(b)(2), is not a concern of magnitude in this case. The final decree, whatever its terms, is expected to apply equally and uniformly throughout the jurisdiction of the Department of Correctional Services.

7. Relatively early in the case, both sides were disposed to have the case go off on summary judgment or on plaintiffs' motion for a preliminary injunction. Counsel were undoubtedly correct in judging that the facts were not extensively disputed and that the main concerns were legal. Rightly or not, however, the court called for further enlightenment about the facts. This led to some further agreements, but also to the taking of testimony from three witnesses for plaintiff and one for defendant. It has been agreed that the case is ready now for final decision upon the file of affidavits, and the large area of agreed facts they disclose, together with the testimony and exhibits presented at a one-day hearing on May 13, 1974.

der their command have known of and not sought to prevent them. People in the Commissioner's office, including at least some with first-hand knowledge of the prisons, have not been ignorant of such facts.

There are no recorded instances of trouble, coercion, violence, or any disruption of discipline resulting from solicitations. This statement is not too broad, even allowing for the limits upon judicial proof. The claim of coercion, or fear of coercion, has been central in this case from the beginning. It has been the subject of pointed inquiries from the court to defendants. An able and imaginative Assistant Attorney General, with ample time for the attempt, has not produced a single example from experience to ground the alleged fear.

To the contrary, the evidence reflects that solicitations have been peaceable and have varied in their effectiveness. Inmates have responded negatively as well as positively to appeals for support. It is not excessively naive, even for a judge, to credit the evidence that goes far to destroy defendants' thesis.

The procedure by which prisoners make contributions from their prison accounts is of sufficient pertinence to be sketched briefly. A prisoner may not have currency in his possession. He is permitted, however, to direct by a voucher that funds go from his account to a designated payee for a designated purpose—as for NAACP dues, a magazine subscription, etc. A prisoner or other person soliciting for a group or cause may obtain a supply of blank vouchers—or, as was done at times in this case, may prepare sheets for a list of signatures and specified amounts—and employ these in signing up members or subscribers. The specified funds thus go directly to the named recipient without passing from inmate to inmate.

Starting from at least October 1972, contributions were sought inside and outside the prisons for the legal and oth-er expenses of the Attica defendants. It was and is expected that very large amounts will be needed. Suggesting the dimensions, the State has appropriated $5,500,000 for the Attica prosecutions. On the defense side, about $100,000 has been pledged to the ABDF from non-inmate sources—mostly in modest amounts, but sometimes in sums of as much as $500 or so from speaking fees of attorneys and others. Within the prisons, many hundreds of those solicited made pledges mounting to a total of perhaps $3,000 or so.[8] The contributions in numerous cases were in the amounts of 25 cents and 50 cents. Scarcely any exceeded two dollars. While the total was thus destined to be only a modest fraction of ABDF's needs, the results reflected some considerable measure of support or, as one inmate witness said, "love" for the Attica defendants. On the other hand, substantial numbers of those solicited refused to pledge anything.

Like other solicitations, those involved here were conducted openly. Bulletin boards and the other devices described earlier were employed. Wardens and corrections officers were fully aware of all this and made no protests or moves to prevent continued solicitations. Nobody was coerced. There was no trouble. There was no hint of violence or disorder.

In January and February 1973, an inmate and Assemblyman Eve communicated with the Commissioner about the proposed arrangements for donations to the ABDF. On February 20, 1973, the Commissioner responded as follows to the inmate:

"I am in receipt of your letters of January 25 and February 16, 1973, concerning the question of inmates donating to various causes, including the Attica Defense Committee and the families of deceased inmates.

"Our present rules prohibiting transfer of money from one inmate's

---

8. The orders ending the drive made it impossible to judge with precision how much had been or would be pledged and given.

account to another, one will find upon investigation, is based on troubles we encountered in the past. Instances of coercion by one inmate upon another to transfer money without his initiation nor his own free volition is the reason the rule has been adopted and adhered to.

"I am sure that in your experience in our facilities you probably have seen instances of coercion of the strong inmate over the weak, the exercise of power of one inmate over the other. Coercion of one inmate by another and the possibility that an inmate may be forced to donate to any cause without his free consent seems to me to be ample cause to not suspend the rule in any solicitation, be it the Heart Fund, the Cancer Fund or any other charitable solicitation.

"There, however, appears to be one way in which an inmate may donate to a cause of his own choosing. And that is by way of sending the money home to his family, with instructions that it be donated to the desired cause. This routine has worked effectively in past years and you may wish to explore it as a viable alternative to our regulations."

On the same day, the Commissioner distributed a memorandum to "All Facilities," attaching a copy of the foregoing letter. The memorandum said:

"Assemblyman Eve reported to me that several prisoners in the institutions have written his office asking to donate moneys from institutional accounts to a special trust account he would set up for use in the defense of those indicted for their part in the Attica tragedy.

"We are answering Mr. Whitfield, Chairman of the Inmate Liaison Committee, Green Haven, as you see from the enclosed, since he wrote us specifically for the Inmate Liaison Committee about this matter.

"I wanted you to have this material as a policy statement of our position in case requests are made of you from prisoners in your institutions to contribute directly to this fund. It is obvious that we feel that if moneys can be donated directly the peer group pressures might get severe. We do, however, feel committed to permit individuals to send moneys to their families for whatever directed use they choose."

The letter and statement, it will be noted, announced that the Department would "not suspend the rule in any solicitation, be it the Heart Fund, the Cancer Fund or any other charitable solicitation." Since there had been no pertinent "rule" of any kind, it is not surprising that this statement, if it was meant to stop charitable solicitations, did not effectively do so. Solicitations for one cause or another actually continued for over a year, and they seem not to be universally or effectively forbidden to this day.

Reflecting at best a striking failure of communication within his Department, defendant Commissioner, in a "Statement of Admitted Facts," said unequivocally that there has been a total "ban on solicitations for charitable organizations * * * in effect at least since [the] * * * letter of February 20, 1973 * * *." The subject is tossed in thorough confusion for most purposes in the institutions defendants administer. The only clear, and clearly intended, result has been the cessation of the ABDF effort to collect funds.

II.

The administrative confusion attending this matter is of significance in itself. It merits fuller description.

The defendant Commissioner, on November 10, 1973, made an affidavit saying, *inter alia*:

"At issue in this lawsuit is whether inmates shall be permitted to solicit funds and to make direct contributions on behalf of the defendants who were indicted as a result of the Attica rebellion. It is my policy not to permit such solicitations and contribu-

tions because permitting them would constitute a poor correctional practice and a bad precedent for future cases.

"Inmates living in close proximity to each other are engaged in a constant struggle to preserve their individuality and to protect themselves from being dominated by stronger men. To allow contributions of this nature is to risk coercion and domination by more aggressive inmates.

\* \* \* \* \* \*

"Permitting direct financial support of inmates who are standing trial may result in the donor feeling compelled to contribute because refusal may be taken amiss, and the donee feeling aggrieved if contributions are not forthcoming. In addition, inmates who made large contributions to the defense of other prisoners would understandably feel that some allegiance is owed to them by the donees at a later time. One needs little imagination to realize that certain inmates, because of their criminal connections in the outside world, have access to enormous funds for legal expenses.

"For these reasons, solicitations are discouraged in the same manner as are direct contributions. Permitting inmates to canvass in the general population for their favorite causes would place other inmates in the position of either being afraid to decline support, or being resentful that support has been elicited from them for fear of being ostracized."

The affidavit was ambiguous. It was not clear whether *all* solicitations were *now* thought to be forbidden (no such thing having been even intimated before February 20, 1973), a matter of

possible consequence in light of plaintiffs' equal protection claims. To the court's request for clarification, defendants responded with the "Statement of Admitted Facts" quoted earlier:

"\* \* \* solicitations of all kinds are now forbidden. The Department of Correctional Services has always prohibited the transfer of funds from the account of one inmate to another, and has always prohibited inmates from soliciting money from each other for any inmate-related purpose. The ban on solicitations for charitable organizations has been in effect at least since former Commissioner Oswald's letter of February 20, 1973 (annexed as an exhibit to defendants' answers to plaintiffs' interrogatories). A copy of this letter was sent by the Department to all correctional facilities advising them of the ban."

On the very day that statement was handed up, however, it became a tissue of clouds and contradictions. It was made clear that the alleged "ban" failed somehow to be effectively conveyed or enforced. While able counsel for defendants struggled to deal fairly with his clients and the court, an earnest Deputy Commissioner groped visibly on the witness stand to seem consistent about supposed regulatory policies he was forced to characterize as "oblique," "tortured," and nowhere expressed in any "clearcut rule \* \* \*." Driven to improvisation, the Deputy Commissioner sought to rest the inchoate "rule" upon an actual rule forbidding transfers of property from inmate to inmate, then upon an unhelpful statute relating to uses of funds earned in work-release employment.[9] Defense counsel acknowl-

---

9. Correction Law, McKinney's Consol.Laws c. 43

"§ 189: Disposition of moneys paid to prisoner for his labor. The amount of such compensation to the credit of any prisoner may be drawn by the prisoner during his imprisonment, only upon approval of the commissioner to aid dependent relatives of such prisoner, or for such other purposes as the commissioner may approve. Such dis-

bursement to aid a dependent relative of a prisoner may be made without the consent of such prisoner upon the certificate of the commissioner of welfare, or other officer performing the duties of a commissioner of welfare, of the community in which such dependent is located. Any balance to the credit of any prisoner at the time of his conditional release as provided by this chapter shall be subject to the draft of the prisoner

edged that neither of these could be thought to cover our problem, but suggested tentatively that they may give support by way of analogy. The suggestion has no weight. Neither the transfer rule nor Correction Law § 189 has ever been claimed before to bar solicitations and contributions. Neither justifies the effectively total suppression of the ABDF.

Called upon to address the key problem of "coercion," the experienced Deputy Commissioner [10] found it "extremely difficult to identify", and said of the particular situation in issue that he is "not that satisfied that we have real proof in any specific case." As has been noted, our record is bare of any proof at all, real or unreal. Defendants' hypothesis is by no means absurd. The books are filled with proof of coercion and its occasions in prison in specific kinds of cases. As the Commissioner said in his affidavit quoted above, a "little imagination," unfettered by experience, might generate a hypothesis that solicitations are coercive. But imaginative hypotheses are not sufficient grounds for denying basic rights, especially when years of concrete experience afford tests of the hypotheses. With rights of the kind here at stake, flat prohibitions cannot be justified on what the Deputy pressed as an undocumented "theory of coercion" where none of the prisons, with their history of solicitations and contributions, reported actual cases and where, more pointedly, there were no reports of "any instances of coercion or threats of any kind in connection with solicitation for the Attica Brothers Defense * * *."

As the Deputy Commissioner made clear, there was no explicit policy of any kind governing solicitations and contributions before the advent of the ABDF. What existed was a settled practice of allowing such activities for a considerable array of causes, never with any untoward incident. In the Deputy's colloquial terms, the decision to bar ABDF contributions, released in an inartistic letter rather than the kind of administrative bulletin or other formal medium normally employed for issuing rules, has resulted in the Department's being "in a bind at the present moment * * *." There was and is no governing rule. The Department is in process, the Deputy reported, of finally "writing an administrative bulletin, which has not been formulated only because we did not wish to, in a sense, change directions in the middle of this court action * * *."

The one "principle" that has allegedly emerged since (and because) the ABDF was stopped in its tracks is that the Department is disposed now, usually or often, to forbid contributions by a prisoner directed from his account to a cause or organization. Instead, as it advised proposed ABDF contributors, prisoners will be told to route payments through their families. Apart from the fact that this cumbersome and chancy procedure will stifle contributions to a large degree, it never has been, and does not seem even now to be intended to be, consistent or principled in its application. The Department is allowing direct assignments of "dues" now to "approved" organizations. Asked to state the "difference between dues and a contribution", the Deputy Commissioner said:

"It is a difficult line to establish, I agree. But what we were talking about hopefully in those cases where

in such amounts and at such times as the commissioner shall approve; provided, however, that at the date of absolute discharge of any prisoner the balance as aforesaid shall be paid to such prisoner."

As has been noted, there appears to be no case until the ABDF appeared in which the "approval of the commissioner" was withheld for contributions to causes. The statute treats, in any event, only one category of prisoner funds. The Attorney General was plainly well advised in disclaiming reliance upon it.

10. This obviously knowledgeable witness holds a graduate degree in correctional administration and had many years of experience in probation, reaching high levels before rising to his present post.

it has been permitted is the continuation of what we felt, in our humble judgment, was a reasonably good cause of national repute that was a continuation of an act started while the man was outside and he chooses and he is able to continue while he is inside. From that point of view, from a programmatic point of view, that is a continuation of positive linkages to the outside and I see that as a positive program."

Asked then if the ABDF was not deemed "positive," the Deputy continued:

"I did not say that. I said we tried very hard, and we sounded a little bit like a Philadelphia lawyer in that memorandum, but we tried to come up with a mechanism to permit the inmate to contribute if he saw fit. That may not be an adequate one in your eyesight, I may agree. We clearly did not say that an inmate who wishes to contribute to the Attica Defense Fund cannot do so."

The Deputy was reminded of the Commissioner's affidavit saying it was the soliciting—"canvassing"—among inmates rather than the procedure for directing contributions that created the fear of coercion. He said:

"I would agree there is that flavor to it. But suffice it to say, we see solicitation in the same realm as we see the right of petition. We do not stop a person from going around and soliciting. What we do in effect is say that where the solicitation has to do with moneys, there is a nullity in that document. You may go around and the inmate population as well as the person soliciting knows that that document has no effect."

Thus, the "rule," still to be formulated, may change in the course of a day in the courtroom.

Likewise, while it remains to be written, the rule is not susceptible of predictable application by its intended authors. What will become of the prisoner who wishes now to join, and pay dues to, the NAACP, as many have been free to do in the past? The Deputy says:

"I would *probably* forbid it, I would let him join the NAACP in his facility but without charge." (Emphasis added.)

It may be hoped that the Deputy will think better, or be caused to think better, of this tentative view before it is frozen into a rule. It is enough for now that there is no rule, only a forecast of what one may "probably" say. It is of cognate interest that, having no rule, the Deputy was free on the witness stand to speak of exceptions for causes deemed laudable and to "find a way to do" things possibly unlawful for such ends.

Expanding after a luncheon recess, the Deputy Commissioner veered from the Department's flat assertions of a total "ban," at least after February 20, 1973, to the view that the "rules" affecting solicitations and contributions would vary from organization to organization. He would not, he said, make judgments about "the philosophy of the organization but [he] would look at the organization, is its purpose broad or narrow?" The ABDF, he said, is narrow:

"Well, there is a kind of, admittedly only an inference, but that where the organization is solely inmate directed, inmate beneficiary, that we saw that inherent in that type of organization is a degree of pressure upon the other residents in our system to have to do something for an inmate population as differentiated from an organization whose thrust is a bit broader."

Elaborating, he said:

"The feeling that we had at that time is that for the sole purpose of an inmate defense fund, that there is a kind of feeling in the resident population that was particularly felt at Attica; that there was a kind of unfortunate we-they. Whatever the views are in terms of what happened in Attica, but clearly among the inmate population there was the kind of feeling that we have been the subject to what they have done to us and there was a kind

of feeling of extra pressure generated by that kind of feeling at that particular time."

The "we-they dichotomy," the Deputy further explained, is less present for groups like the ACLU and the NAACP. It did not prevent solicitations and contributions for a prisoners' union. Even with respect to the ABDF itself, it "is not as real and not as strong at the present moment as it was in February '73"—i.e., some 32 rather than 17 months after the Attica violence.

Thus speaks the "rule" by which power is exercised over people in prison seeking assistance, or to assist each other, in legal proceedings.

### III.

The protests of the plaintiffs against the destruction of their organizational efforts present interwoven claims under (1) the First and Sixth Amendments as these apply to the States under the Fourteenth, and (2) directly under the Due ·Process and Equal Protection Clauses of the Fourteenth.

■■ Whether indicted or not, the inmates have a right to associate together for effective vindication of shared interests in litigation. N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963) ; Brotherhood of Railroad Trainmen v. Virginia Bar Association, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964) ; United Mine Workers v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ; United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971). Whether the ABDF enterprise be viewed as a form of organization to further shared interests, or, as a witness called it, as an expression of "love" for creatures in shared misery ("deserved" or not), the First Amendment character of the asserted interests seems evident. This conclusion follows from the settled proposition that protected modes of expression and association extend beyond any "narrow, literal conception of freedom of speech, pe-

tition or assembly." N. A. A. C. P. v. Button, *supra*, 371 U.S. at 430, 83 S.Ct. at 336 ; see generally, Emerson, Freedom of Association and Freedom of Expression, 74 Yale L.J. 1 (1964). If these propositions are sound in the context of civil litigation, for rights under the law of torts as well as the Constitution, United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 33 (1971) ; United Mine Workers v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L. Ed.2d 426 (1967) ; Brotherhood of Railroad Trainmen v. Virginia Bar Association, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed. 2d 89 (1964), they are scarcely more doubtful where the higher stakes of criminal prosecutions are involved.

■ More narrowly, more immediately, and not less importantly, plaintiffs seek implementation of their "right of access to the courts." Goodwin v. Oswald, *supra*, 462 F.2d at 1241. Though the explicit development of that right for prisoners was tardier than it should have been, its incidents now include without question the right to seek by all suitable means the financial support vital for effective representation. United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 585–586, 91 S. Ct. 1076, 28 L.Ed.2d 33 (1971) ; Goodwin v. Oswald, *supra*, 462 F.2d at 1241; see also McDonough v. Director of Patuxent, 429 F.2d 1189 (4th Cir. 1970).

To justify the impediments they have interposed, defendants

"must show 'a compelling state interest centering about prison security, or a clear and present danger of a breach of prison security, * * * or some substantial interference with orderly institutional administration.' "

Goodwin v. Oswald, *supra*, 462 F.2d at 1244, quoting from Judge Weinfeld's opinion in Fortune Society v. McGinnis, 319 F.Supp. 901, 904 (S.D.N.Y.1970). Nothing of the sort has been shown. "[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom

of expression." Tinker v. Des Moines School District, 393 U.S. 503, 508, 89 S. Ct. 733, 737, 21 L.Ed.2d 731 (1969). Defendants' "conclusory predictions," Goodwin v. Oswald, *supra,* 462 F.2d at 1244, are not supported, but are belied, by the undisputed facts before us. Occasions for coercion are undoubtedly possible or imaginable in almost any kind of activity within the charged confines of prison walls. There may be fist fights—or killings even—from group therapy sessions, decisions of the baseball coach, selections for prison dramas, political discussion groups, literary disputations in English classes, etc. The solution has not been blanket prohibitions against possibly "dangerous" activities. On the contrary, while the clock does not race, the tendency, in New York and elsewhere, has been to experiment more rather than less with tastes of freedom and challenge as possibly hopeful ways of promoting rehabilitation and later adjustment on the outside.[11]

It is well for us to remember that "the judge in his quiet chambers * * * will [not] have to handle trouble if this should occur." Goodwin v. Oswald, *supra,* 462 F.2d at 1250 (Friendly, C. J., dissenting). Heeding that, but mindful too that the Bill of Rights is not a risk-free set of guaranties, we are to enforce the Constitution by our lights and under controlling authority. "A policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution." Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Here, with all deference to defendant state officials, our mandate seems plain.

Defendants have not justified the sweeping repression of ABDF efforts. They have failed to show that means far less drastic could not serve to avoid the dangers of coercion (however unreal these seem on our record) while preserving the fundamental rights of the plaintiffs. Cf. Procunier v. Martinez, *supra*; United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).[12]

The record of this case sustains plaintiffs' charge that defendants have focused with sharp and unprecedented hostility upon the ABDF. It is not necessary to review the undisputed evidence that soliciting and contributing went on for years before this case, openly and without hindrance, in New York's prisons. But even if the ABDF had served only as an *occasion* for the newly restrictive policies rather than an exclusive target, this sort of *ad hoc,* undefined, unprincipled control may not be exerted against rights as vital as the ones in issue. Evidently recognizing this, defendants have talked vaguely of applicable "rules." But there were no rules and there are none yet in the meaningful, evenhanded sense of the

11. See the testimony of Deputy Commissioner Edward Elwin in the instant case explaining the modern "philosophy" of prison administrators which favors steps "to aid and abet the development under certain constraints of inmate based organizations, on the theoretical basis, that, one, it was a positive force within the institution; that it served as a bridge between behavior in the institution and outside, and hopefully it would create the kinds of relationships that would have meaning to the men at the point that they came out on the streets."

12. Defendants say inmates are "free" to have contributions routed through their families. The record of this case makes plain what we could have known—that this is a mockery and an illusion. Coming whence they do, many prisoners have no families, or none they can rely upon. Where there is a family, and where its members can be relied upon to transmit the money, the process is cumbersome and time-consuming, requiring four or five weeks for the journey from inmate through account-keeping agency to family and then to the payee. One could expect that this as an exclusive means would effectively kill a drive for funds. The expectation was realized in this case. As against the several thousands of dollars the inmates ordered paid from their accounts, actual receipts from this source over the wall defendants erected were about $13 at the time of our hearing, May 13, 1974.

concept. There is only a vague, changeable, tentative forecast of a possible rule that may or may not apply even to the ABDF depending upon the time, place, and the nebulous feelings of prison authorities.

▮ A regime so arbitrary and capricious is the essence of what the due process protection is meant to outlaw. Where, as here, precious constitutional rights are involved, officials may impose constraints only under known, reasonably stable, equally applicable rules. See, e. g., Brown v. Louisiana, 383 U.S. 131, 142–143, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Cox v. Louisiana, 397 U.S. 559, 569, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Cox v. New Hampshire, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1940). The kind of ad hoc restraints defendants have imposed, curbing fundamental rights, amount also to denials of equal protection, a constitutional assurance that tends to merge in cases like this with the right to due process. Cf. Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 220 (1885); Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1953).

This is not to suggest that a total prohibition against all solicitations and contributions—what defendants erroneously claim they have had or vaguely opine they will have—would fare any better. Indeed, after so many years of trouble-free support by prisoners of groups like the ACLU, the Junior Chamber of Commerce, and the NAACP, it is saddening to observe in the fallout from Attica the grim decision to destroy the whole as a rationale for fighting the ABDF. The prospect is not made more cheerful or more tenable in law by defendants' invocation of Katz v. McAulay, 438 F.2d 1058 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972), where a state rule prohibiting solicitation in the public schools was sustained. The emphasis throughout that decision was upon the protection of "school children" (p. 1060) by means found to effect a "minimal potential interference at most" (p. 1061). The so-

licitation for a selfless cause could proceed freely outside the school during the free time of the free youth involved. The narrow ruling, cf. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), even assumed "that a state may decide that the appropriate discipline which requires the restriction of certain communicative actions may differ in the cases of university students from that called for in the cases of the younger secondary school pupils in relatively similar circumstances." Katz v. McAulay, supra, 438 F.2d at 1061 n. 5.

The present case of people in prison, concerned with rights of urgent and direct importance to themselves, is distinctly different. Prisoners are not children. More vitally for legal purposes, they have no place but prison in which to communicate and exercise the rights they retain. The prohibition here is total, not "minimal."

▮ The court notes finally defendants' suggestion that plaintiffs' rights are not violated because (a) they can raise relatively little money from among themselves—i.e., the classes of inmates—, (b) they are free to raise money from others, and (c) the ABDF has in fact obtained much larger sums from others than those pledged by prisoners. This extraordinary line of argument is an afterthought that was never part of defendants' supposed justifications on the scene. More critically, it rests upon premises at war with the Constitution. As to plaintiffs' right of association for mutual support, including the emotional and intellectual sharing of goals pursued and expressed through material contributions, these may not be parsed or disintegrated by counting dollars. Nor is it sound to argue that the right to raise money for legal services (and for broader concerns for prisoners' rights) may be set at naught if its claimants are not rich and powerful and are therefore unlikely to generate adequate resources from their own ranks. The course of self-help and individualism may be rugged at times, but it remains high among our national values. Having crushed

plaintiffs' efforts in their inception, defendants will not be heard to say the efforts could never have amounted to much. We do not know, after all, how much plaintiffs could have raised in repeated contributions, month after month, if defendants had not barred the way. In any event, transcending computations of this nature, the great rights under our Constitution are for the ragged pamphleteer not less than the proud daily newspaper, for the nearly penniless client asserting his self-reliant dignity not less than the giant corporation asserting its privileges.

Plaintiffs are entitled to the injunctive relief they seek. A form of final decree in their favor will be settled on notice.