Fuchsberg, J.
(dissenting). At the heart of our adversary system is equal access to the law by both parties through trained counsel. Absent such representation, especially in matters where important legal rights are contested, litigants may be expected to find themselves handicapped by ignorance or even fear of the law, on the one hand, and by lack of the expertise required for effective advocacy, on the other. "Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries,” (Railroad Trainmen v Virginia Bar, 377 US 1, 7). "Even the intelligent and educated layman has small and sometimes no skill in the science of law.” (Powell v Alabama, 287 US 45, 69.)
Time was when this right to counsel, expressly provided for in criminal cases by our State and Federal Constitutions themselves (US Const, 6th Amdt; NY Const, art I, § 6), was read to mean the right to appear through counsel if a party had one. Since, for those who did not possess means, there *323 were very few places to which they could turn for counsel, that meant that for most people the promise of legal representation was nothing but a mirage. In civil cases too, where the right to counsel has even a more ancient lineage long antedating the Constitutions (Hisey, Right to Counsel in Civil Matters, 31 NLADA [National Legal Aid and Defender Assn] Briefcase 302; Comment, Right to Counsel in Civil Litigation, 66 Col L Rev 1322, 1326), the practical result was to assure counsel for the rich but not for the poor. It followed that justice itself was rationed in like malproportion.
In very recent times, however, as part of a quest for values that place substance above form, the ramparts of unresponsiveness to equal need for counsel have begun to fall. The attack has come from several directions. The private sector’s contribution has been mainly in support of legal aid societies, the Bar’s through a renewed sense of professional responsibility, the Legislature by financing legal service and public defender programs, but, above all, the judiciary by mandating the availability of counsel as an ingredient of due process, for paupers as for princes, have infused into operative justice the living reality that only learned, wise and conscientious counsel can bring. (See Argersinger v Hamlin, 407 US 25 [misdemeanor criminal case]; Gideon v Wainwright, 372 US 335 [felony criminal case]; Matter of Ella B., 30 NY2d 352 [Family Court]; People ex rel. Menechino v Warden, 27 NY2d 376 [parole hearing]; People ex rel. Rogers v Stanley, 17 NY2d 256 [mental patients]; Jacox v Jacox, 43 AD2d 716 [matrimonial litigation]; Hotel Martha Washington Mgt. Co. v Swinick, 66 Misc 2d 833 [summary eviction]; Cleaver v Wilcox, 499 F2d 940; and other cases cited in text and footnotes of my dissenting opn in Matter of Smiley, 36 NY2d 433.)
Now the circumstances of this case confront us with the opportunity and, I believe, the responsibility to take another step forward in the implementation of the evolving availability of counsel principle. For there is a confluence of factors which, individually and all the more so in concert, cry out for judgment directing assignment of counsel, as petitioned for by appellant.
Firstly, since the hearing for which such assignment of counsel is sought has as its purpose an intent to revoke the petitioner’s public assistance, it is not disputed it involves a factual pattern parallel to that in Goldberg v Kelly (397 US 254). There the court, after reminding us that "[for] qualified *324 recipients, welfare provides the means to obtain essential food, clothing, housing and medical care” (p 264), held that, therefore, "constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation * * * or to denial of a tax exemption * * * or to discharge from public employment” (p 262, cited cases omitted). It went on to make clear that one so threatened is entitled to a due process hearing and the right to be represented by counsel (p 270). That is the law of the land. Yet, it goes without saying that a legitimate welfare recipient, as petitioner must be presumed to be until properly proved otherwise, and whose very survival is thus threatened, is, by definition, unable to afford to pay counsel, so that, unless it or the means to procure it is provided for him, the Supreme Court’s grant of the right to counsel becomes an empty gesture.
Secondly, respondent’s hearing examiner advised petitioner that the termination charges contained what have been succinctly but accurately summarized as serious allegations which, if proved, might constitute fraud. Such fraud is punishable by the imposition of criminal penalties and, to that end, must be reported to the District Attorney by the welfare officials. (Social Services Law, § 145; 18 NYCRR 348.2.) Concededly conscious of that jeopardy, the examiner adjourned the hearing at least twice to enable petitioner to obtain counsel, but his moneyless efforts to do so were fruitless.* As Mr. Justice Hopkins so well put it in the Appellate Division (45 AD2d 858, 859), the petitioner was then reduced to a legal plight in which "he is called on to refute the claims for termination of benefits [and] make statements which may be later used against him in a criminal prosecution. Indeed, his dilemma, measured in terms of a choice between a defense in the hearing and a criminal sentence, is nearly insoluble.”
Thirdly, the agency itself may choose to be, and most often is, represented by counsel at such hearings. Petitioner, particularly with what is at stake at his hearing, and in the context of an adversary proceeding, should not have to rely on administrative paternalism or the haphazardness of self-representation.
*325 There remains the matter of money. No advances in the right to be actually represented by counsel have ever come about without meeting the cry of cost. We live in an affluent society, but one in which, who would gainsay, there are also large pockets of poverty, while at one and the same time there are many wasteful and foolish expenditures. Our budgetary priorities are certainly not all the right ones. Reordering some of them so as to provide a vital societal need is nothing at which we should cavil.
Very few values, if any, are more important than a viable system of justice. It cannot be denied that involved here is an essential of the administration of justice, a matter peculiarly within the province of our branch of government. I respectfully suggest that in such matters courts are called upon to take the lead rather than exercise restraint. That to me also appears the surest way, where necessary, to obtain the implementing support of the other branches of government.
Only very recently, in a case involving, inter alia, a request for expedited welfare hearings to assure prompt relief, faced with a like economic argument we said that "administrative difficulties that are imposed thereby upon the commissioners, both in the incurment of increased expenses and in the assignment of staff * * * are outweighed, however, by the urgent need for a meaningful hearing at a meaningful time [citing cases].” (Matter of Jones v Berman, 37 NY2d 42, 56.) I do not believe we should shrink from taking a like stand here.
I, therefore, dissent and would vote to reverse the order of the Appellate Division and in favor of the granting of petitioner’s application.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler and Cooke concur with Judge Jasen; Judge Fuchsberg dissents and votes to reverse in a separate opinion.
Order affirmed, without costs.

 Queens Legal Services Corporation, whose limited staff was already too overburdened with cases of indigent citizens to undertake to represent him, apparently regarded his case as meritorious enough to undertake this proceeding to seek an order that respondent provide petitioner with counsel.