WOLL v ATTORNEY GENERAL

1. CONSTITUTIONAL LAW—CRIMINAL LAW—STATUTES—REGULATION OF
   COMMERCIAL SPEECH—CASE IN CONTROVERSY—CONSTITUTION-
   ALLY PROTECTED RIGHTS.

   The standard to be used in a review of the constitutionality of a
   criminal statute prohibiting certain forms of commercial speech
   and conduct is whether the statute, as applied to the case in
   controversy, infringes on constitutionally protected rights.

2. CONSTITUTIONAL LAW—CRIMINAL LAW—STATUTES—SOLICITATION OF
   PERSONAL INJURY CLAIMS—FACIAL OVERBREADTH—LIMITING
   CONSTRUCTION—PROTECTED CONDUCT.

   The criminal statute which prohibits the solicitation of personal
   injury claims is not a proper subject for facial overbreadth
   analysis; facial overbreadth should not be invoked when a
   limiting construction has been or could be placed on the chal-
   lenged statute, and equally important, overbreadth claims, if
   entertained at all, should be curtailed when invoked against
   ordinary criminal laws that are sought to be applied to pro-
   tected conduct.

3. CONSTITUTIONAL LAW—CRIMINAL LAW—STATUTES—SOLICITATION OF
   PERSONAL INJURY CLAIMS—AMBULANCE CHASING—GROUP LE-
   GAL SERVICES—FIRST AMENDMENT.

   A criminal statute which prohibits the solicitation of personal
   injury claims was not applied in violation of an attorney's
   constitutionally protected First Amendment rights where the

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 16 Am Jur 2d, Constitutional Law §§ 341, 342, 345–347.
   The Supreme Court and the right of free speech and press. 2 L Ed
   2d 1706, 16 L Ed 2d 1053.
[2–4] 7 Am Jur 2d, Attorneys at Law §§ 40–42.
   73 Am Jur 2d, Statutes §§ 155–160, 346.
   "Ambulance chasing" or similar solicitation of personal injury cases
   as ground for disbarment, suspension, or other disciplinary ac-
   tion. 67 ALR2d 859.
   Indefiniteness of language as affecting validity of criminal legisla-
   tion or judicial definition of common-law crime—Supreme Court
   cases. 16 L Ed 2d 1231.

attorney's conduct constituted hard-core ambulance chasing; however, the anti-solicitation statute could not be lawfully applied to the kinds of group legal services that enjoy First Amendment protection under United States Supreme Court case precedent (MCLA 750.410; MSA 28.642).

4. CONSTITUTIONAL LAW—CRIMINAL LAW—STATUTES—SOLICITATION OF PERSONAL INJURY CLAIMS—CLASSIFICATION—PROPERTY DAMAGES CLAIMS—AMBULANCE CHASING—PAIN AND SUFFERING.

The failure of the criminal statute which prohibits the solicitation of personal injury claims to include property damage claims is neither irrational nor an arbitrary classification and is an inadequate basis for a finding of an unconstitutional denial of due process because the possibility of big verdicts which is what gives rise to ambulance chasing is directed primarily to jury assessment of pain and suffering in personal injury situations and property damage claims are not significantly involved in the evil to which the statute is directed (MCLA 750.410; MSA 28.642).

Appeal from Wayne, Horace W. Gilmore, J. Submitted October 4, 1977, at Detroit. (Docket Nos. 29914, 30051.) Decided January 23, 1978.

Complaint by Arthur S. Woll against Frank J. Kelley, Attorney General of the State of Michigan, and William L. Cahalan, Prosecuting Attorney for the County of Wayne for a declaratory judgment that the Michigan statute prohibiting solicitation of personal injury claims is unconstitutional, and for an injunction restraining defendants and their employees from attempting to enforce the statute. Judgment for plaintiff. Defendants appeal. Reversed.

*Ivan E. Barris* and *Michael H. Golob,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Thomas L. Casey,* Assistant Attorney General, for defendant Kelley.

*William L. Cahalan,* Prosecuting Attorney, *Theodore Stephens,* Deputy Chief, Civil Department, and *Rheo C. Marchand,* Assistant Prosecuting Attorney, for defendant Cahalan.

Before: D. F. WALSH, P. J. and V. J. BRENNAN and BEASLEY, JJ.

BEASLEY, J. On April 1, 1976, plaintiff commenced an action for a declaratory judgment[1] that the Michigan statute[2] prohibiting solicitation of personal injury claims was unconstitutional. He claimed that since he and his law firm represent persons suffering injury by accident, including workmen's compensation claims, an actual controversy existed between himself and defendants by reason of a grand jury investigation then in progress.

Defendants filed an answer and motion for accelerated and/or summary judgment, claiming that there was no "actual controversy". However, this motion was rendered moot when, on April 29, 1976, plaintiff was indicted by a Wayne County Citizens Grand Jury in an indictment charging him and others with, among other things, conspiracy to solicit personal injury claims and solicitation of personal injury claims in violation of the above mentioned anti-solicitation statute.

Plaintiff then moved for summary judgment based on the allegation that no genuine issue of fact existed; this change in the form of the action was deemed appropriate in light of the entry of the indictment. The trial court ruled on the motion in an opinion determining that the anti-solicitation statute is unconstitutional on the grounds that it is overbroad and denies equal protection of

---

[1] GCR 1963, 521.

[2] MCLA 750.410; MSA 28.642.

the law. Defendants appeal as of right from the order entered in accordance with the opinion.

In his carefully prepared opinion, the trial judge concluded that the anti-solicitation statute was not inherently and impermissibly vague. We agree. While the outer boundaries of the anti-solicitation statute may be imprecise, there is no ambiguity concerning the proscribed hard-core ambulance chasing with which plaintiff lawyers are charged. The statute affords adequate notice to lawyers, such as these plaintiffs, of what is prohibited.

The court then considered whether the statute, on its face, was so overbroad as to be an unconstitutional infringement upon First Amendment rights. The court held that the statute was unconstitutionally overbroad, that the possibility of a narrowing construction was limited, and that, based upon *Virginia State Board of Pharmacy v Virginia Citizens Consumer Council*,[3] the commercial nature of the regulated activity did not change the applicable measure of constitutional protection.

For purposes of this opinion, the controlling question is whether the trial court applied the correct constitutional standard to the challenged criminal statute. We hold that the trial court erred when it held that the statute was unconstitutional under the standard of so-called "facial overbreadth". We further hold that, in the context of review of a criminal statute prohibiting certain forms of commercial speech and conduct, the standard to be used is whether the statute, as applied in the case in controversy, infringes on constitutionally protected rights.[4]

---

[3] 425 US 748; 96 S Ct 1817; 48 L Ed 2d 346 (1976).

[4] Much attention, both judicial and academic, has been devoted to the difference between measuring the constitutionality of a statute by examining its plain terms and by examining its application to the

Helpful perspective on the present issue is gained by a review of prior cases. In 1927, in *Kelley v Judge of Recorder's Court of Detroit,*[5] the Michigan Supreme Court found no problem in adjudicating the statute constitutional. That Court defined ambulance chasing in disparaging terms.[6] In *Hightower v Detroit Edison Co,*[7] the Supreme Court dealt at greater length with the evils of

---

actual facts in question. For example, an excellent presentation of the history, purpose and utilization of both is set forth in *The First Amendment Overbreadth Doctrine,* 83 Harv L Rev 844 (1970).

[5] 239 Mich 204; 214 NW 316 (1927).

[6] "Evidently 'ambulance-chaser' is a recognized colloquial word of our English vocabulary. * * * [I]n later years as personal injury litigation increased and ethical restrictions on the legal profession decreased, that sinister compound word appears to have assumed in popular usage the following meaning, as defined by some lexicographers:

" 'A person, either a lawyer or the agent of a lawyer, who follows up cases of accident in the streets and tries to induce the injured person to bring suit for damages.' Cent. Dict. and Cyclop.

\* \* \*

"Though both are torts, there exists a marked difference between injuries inflicted on the person and injuries done to property, plainly recognizable in fact and reasonably distinguishable in law. Property, whether personal or real, has as a rule some fairly determinable market value susceptible of definite proof, within limits beyond which neither evidence nor expectation can range. Market value for personal injuries is unknown. The measure of damages and rules of proof are distinctly different in injury to property and personal injury cases. Pain and suffering, disfiguration, permanency, humiliation and other personal elements foreign to property which have no distinct standard of money measurement are permissible elements of damages in the latter. This may and often does in the minds of many give rise to great expectations and surrounds such claims with a tempting atmosphere of speculation unknown to property tort actions inviting to litigation and exploitation as generally known and so indicated by the proportion of such actions crowding our courts. These and other special attributes of personal injury claims fairly suggest a reasonable basis of distinction between them and other kinds of claims and even between the kinds of persons who might engage in soliciting them for collection. Extended discussion of the subject of classification is not necessary for the purposes of this case. The fundamental rule of classification is that it shall not be arbitrary, must be based on substantial distinctions and be germane to the purpose of the law." 239 Mich 204, 210, 213–214; 214 NW 316 (1927).

[7] 262 Mich 1; 247 NW 97 (1933).

ambulance chasing, in denying attorney fees to an attorney who had been hired by a lay solicitor of personal injury claims.

In 1947, the anti-solicitation statute was amended to include organizations of any kind. The amendment did not alter the rulings in the two cited Michigan cases.

The anti-solicitation statute was involved in the long, drawn out litigation in *United Transportation Union v State Bar of Michigan.*[8] Defendant, State Bar, had obtained an injunction in 1962 enjoining the union from, among other things, furnishing legal advice regarding potential claims, giving to selected attorneys the names and addresses of potential claimants, and advising members that a recommended lawyer will defray costs on the ground that these acts violate the Michigan anti-solicitation statute.[9] After the decision in the Virginia case,[10] the Michigan Supreme Court had, accordingly, remanded for modification of the injunction. Then the Michigan Supreme Court had heard further appeal.[11] In none of these decisions did the constitutionality of the anti-solicitation statute come squarely in issue. Rather, the U. S. Supreme Court held that the particular acts of the union were entitled to First Amendment protection. The thrust was not to strike down the statute

---

[8] 401 US 576; 91 S Ct 1076; 28 L Ed 2d 339 (1971), reversing 383 Mich 201; 174 NW2d 811 (1970), which grew out of 374 Mich 152; 132 NW2d 78 (1965); *also see, United Mine Workers of America, District 12 v Illinois State Bar Association,* 389 US 217; 88 S Ct 353; 10 L Ed 2d 426 (1967), and *Brotherhood of Railroad Trainmen v Virginia ex rel Virginia State Bar,* 377 US 1; 84 S Ct 1113; 12 L Ed 2d 89 (1964).

[9] It is interesting that the Supreme Court editor in *State Bar of Michigan v Brotherhood of Railroad Trainmen,* 374 Mich 152; 132 NW2d 78 (1965), described the injunction as enjoining the "channeling of liability claims of its members to its regional counsel".

[10] *Brotherhood of Railroad Trainmen v Virginia State Bar, supra.*

[11] *State Bar of Michigan v Brotherhood of Railroad Trainmen,* 383 Mich 201; 174 NW2d 811 (1970).

as unconstitutional. However, the Supreme Court decision made it unmistakably clear that with respect to the conduct described in the injunction, the anti-solicitation statute would be (or was) unenforceable and unconstitutional.

The trial judge, in reliance upon the preceding cases, stated:

"It is therefore clear that in the context of group legal practice, state regulations and statutes against solicitation must fall in the face of the First Amendment."

Of Course, we are not here dealing with group legal services in the context of the cited Federal cases. Rather, we have a charge of ambulance chasing as defined in the Michigan cases. As a matter of fact, in *Brotherhood of Railroad Trainmen v Virginia,* Justice Hugo Black expressly distinguished ambulance chasing in the following language:

"Here what Virginia has sought to halt is not a commercialization of the legal profession which might threaten the moral and ethical fabric of the administration of justice. It is not *'ambulance chasing'.* The railroad workers, by recommending competent lawyers to each other, obviously are not themselves engaging in the practice of law, nor are they or the lawyers whom they select parties to any soliciting of business."[12]

Under traditional procedure, the issue in this case would be, is the conduct here charged against plaintiff lawyers in the criminal information, constitutionally protected speech under the First Amendment to the U. S. Constitution? In *Broa-*

---

[12] *Brotherhood of Railroad Trainmen v Virginia State Bar,* 377 US 1, 6–7; 84 S Ct 1113, 1117; 12 L Ed 2d 89, 93 (1964).

*drick v Oklahoma,*[13] the U. S. Supreme Court, with Justice White writing, has articulated in clear, straight forward words, the very few classes of cases where the constitutionality of a statute may be reviewed on the ground of facial overbreadth:

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will *not* be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. * * * A closely related principle is that constitutional rights are personal and may not be asserted vicariously. * * * These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. * * * Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court:

* * *

"In the past, the Court has recognized some limited exceptions to these principles, but only because of the most 'weighty countervailing policies'. * * * Another exception has been carved out in the area of the First Amendment.

"It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. * * * As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area— 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regu-

---

[13] 413 US 601, 610–616; 93 S Ct 2908, 2915–2918; 37 L Ed 2d 830, 839–842 (1973). (Citations omitted; emphasis added.)

lated by a statute drawn with the requisite narrow specificity'. * * * Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

"Such claims of facial overbreadth have been entertained in cases involving statutes which, by their terms, seek to regulate 'only spoken words'. * * * In such cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes. Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations. * * * Facial overbreadth claims have also been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct, * * * and where such conduct has required official approval under laws that delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights.

* * *

"The consequence of our departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression. Application of the overbreadth doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute. * * * *Equally important, overbreadth claims, if entertained at all, have been curtailed when invoked against ordinary*

*criminal laws that are sought to be applied to protected conduct.* \* \* \* The Court did not hold that the offense 'known as breach of the peace' must fall in toto because it was capable of some unconstitutional applications, and, in fact, the Court seemingly envisioned its continued use against 'a great variety of conduct destroying or menacing public order and tranquility'. \* \* \* Similarly, in reviewing the statutory breach-of-the-peace convictions involved in \* \* \* the Court considered in detail the State's evidence and in each case concluded that the conduct at issue could not itself be punished under a breach-of-the-peace statute. \* \* \* Additionally, overbreadth scrutiny has generally been somewhat less rigid in the context of statutes regulating conduct in the shadow of the First Amendment, but doing so in a neutral, noncensorial manner.

\*    \*    \*

"It remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate. \* \* \* But the plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' towards conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. \* \* \* To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that § 818 is not substantially overbroad and

that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."

Thus, in *Broadrick,* the Court recognized a very limited exception in the First Amendment area, but went on to hold that the Oklahoma statute prohibiting partisan political activity by certain state employees did not come within the exception.[14]

In spite of the quoted portions from *Broadrick,* the trial court concluded the anti-solicitation statute is unconstitutional as overbroad. In so ruling, the able trial judge concluded that *Kelley* and *Hightower, supra,* viewed in the light of the greatly expanded concepts of freedom of expression, cannot serve as narrowing interpretations that would limit the thrust of the statute to matters not constitutionally protected.

He says the broad sweep of the statute might prohibit possible plans for group legal services by "labor unions, consumer groups, [and] civic organizations", (that is, if it were not for the cited Federal cases which hold such plans to be constitutionally protected speech under the First Amendment).

He concludes that the statute must be struck down as unconstitutional, whether or not it would be unconstitutional as applied to the conduct charged to plaintiff lawyers. In fact, he suggests that an amended statute could, perhaps, prohibit ambulance chasing if it were sufficiently limited, that is, not overbroad in the sense that he concludes.

Subsequent to the trial court's decision, the U. S.

[14] 413 US 601, 618; 93 S Ct 2908, 2919; 37 L Ed 2d 830, 843-844 (1973).

Supreme Court decided *Bates v State Bar of Arizona*,[15] holding that the blanket suppression of advertising by the organized bar violated the free speech clause of the First Amendment to the U. S. Constitution since lawyers may constitutionally advertise the prices at which certain routine legal services will be performed.

In so many words, the *Bates* Court declined to apply the overbreadth doctrine to professional advertising. The Court stated:

"In the usual case involving a restraint on speech, a showing that the challenged rule served unconstitutionally to suppress speech would end our analysis. In the First Amendment context, the Court has permitted attacks on overly broad statutes without requiring that the person making the attack demonstrate that in fact his specific conduct was protected. * * * Having shown that the disciplinary rule interferes with protected speech, appellants ordinarily could expect to benefit regardless of the nature of their acts.

"The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. * * * The reason for the special rule in First Amendment cases is apparent: an overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute. * * * Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.

"But the justification for the application of over-

---

[15] 433 US 350; 97 S Ct 2691; 53 L Ed 2d 810 (1977).

breadth analysis applies weakly, if at all, in the ordinary commercial context. As was acknowledged in * * * there are 'common sense differences' between commercial speech and other varieties. * * * Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. * * * Moreover, concerns for uncertainty in determining the scope of protection are reduced; the advertiser seeks to disseminate information about a product or service that he provides, and presumably he can determine more readily than others whether his speech is truthful and protected. * * * Since overbreadth has been described by this Court as 'strong medicine', which 'has been employed * * * sparingly and only as a last resort', * * * *we decline to apply it to professional advertising,* a context where it is not necessary to further its intended objective."[16]

In reliance upon *Broadrick* and *Bates,* we hold that this criminal statute limiting certain commercial solicitation is not a proper subject for facial overbreadth analysis.

Having held that the statute is not subject to attack under a facial overbreadth standard, it remains to be answered whether the statute, in this case, is being applied in violation of plaintiff's constitutionally protected First Amendment rights. We hold that its application here is constitutional.

The trial court did not have the benefit of two decisions which greatly assist the consideration of this statute.[17] First of all, in the very language in which it declined to decide the question, *Bates* gives guidance as to the types of activities which may be constitutionally restrained:

---

[16] 433 US 350, 379–381; 97 S Ct 2691, 2707–2708; 53 L Ed 2d 810, 833–834 (1977). (Citations omitted; emphasis added.)

[17] The prior reported case involving plaintiff is of no assistance on the question of impermissible solicitation since that issue was not addressed. *State Bar of Michigan v Woll,* 387 Mich 154; 194 NW2d 835 (1972).

"Second, we also need not resolve the problems associated with in-person solicitation of clients—at the hospital room or the accident site, or in any other situation that breeds undue influence—by attorneys or their agents or "runners". Activity of that kind might well pose dangers of over-reaching and misrepresentation not encountered in newspaper announcement advertising. Hence, this issue also is not before us.

\* \* \*

"Similar objections might justify restraints on in-person solicitation."[18]

Second, the Michigan Supreme Court now has given further guidance regarding what type of conduct constitutes impermissible solicitation by an attorney. In *State Bar Grievance Administrator v Jaques,*[19] it was alleged that defendant, four days after the tragic Port Huron tunnel explosion, had initiated an in-person meeting with potential claimants with whom defendant had no prior professional contact. Further, it was alleged that defendant had requested a union agent and others to recommend defendant to survivors of explosion victims. In applying their own disciplinary rules, the Court said:

"Conduct violating rules of ethics adopted by this Court and conduct exposing the profession to obloquy, contempt, censure or reproach are grounds for discipline. State Bar Rule 15, §§ 2(2), 2(3) and 2(4). The kind of solicitation involved in this case remains the classic example of the public conception of "ambulance chasing" which not only exposes the profession to public contempt, but unjustly exposes its thousands of innocent individual members to concomitant derision and

---

[18] 433 US 350, 366, 384; 97 S Ct 2691, 2700, 2709; 53 L Ed 2d 810, 825, 836 (1977).

[19] 401 Mich 516; 258 NW2d 443 (1977).

contempt despite their steady allegiance to ethical norms and professional self-discipline."[20]

The type of activity charged in this case goes well beyond that found to be impermissible solicitation in *Jaques.* For example, one count of the indictment states, in part:

"* * * is and was at times relevant herein President of United * * * Union Local * * *. The said * * * invited retired Local * * * members to numerous meetings by letter, stating that they could make application for workmen's compensation at the meeting. He further stated that the President's Office (himself) was the only person in Local * * * who was authorized to assist them in making their claims. At the meetings he told the retired members that they had all worked for a number of years and had all probably suffered injuries and that they had workmen's compensation awards coming to them. He had distributed and collected cards for the members to fill in their names and addresses. He introduced Attorney ARTHUR S. WOLL to them who spoke to them. After the meetings, the retired members were contacted by ARTHUR S. WOLL, ROBERT A. KOZLOW or a person from the law firm of KOZLOW, JASMER & WOLL, P. C. and asked to give information regarding their claim. * * * President of Local * * * , and * * * , Recording Secretary of Local * * * , then received lump sum checks from the law firm of KOZLOW, JASMER & WOLL, P. C. ranging from approximately $55.00 to $110.00 per claimant. The checks were in amounts between $110.00 to $1,750.00 and amounted to over $15,000.00 in one year's time in the partial amount of checks that the Grand Jury looked at."

We will not dignify this alleged conduct with an extensive discussion. Suffice it to say that we see no problem in the application of this statute to restrain the charged conduct.

[20] 401 Mich 516, 543–544; 258 NW2d 443 (1977). (Footnote omitted.)

In so ruling, we do not suggest that the anti-solicitation statute could be lawfully applied to the kinds of group legal services that enjoy First Amendment protection under *National Association for the Advancement of Colored People v Button*[21] and its successors.

We also note that *People v Posner*[22] was decided by another panel of this Court *before* release of *Bates v State Bar of Arizona, supra.*

The trial court also concluded that the anti-solicitation statute denied defendant equal protection of the laws because it proscribes solicitation of personal injury claims, but not property damage claims.

We disagree. As indicated in *Kelley and Hightower, supra,* the statute is directed at ambulance chasing. We do not find the classification irrational or arbitrary. Failure to include solicitation of property damage claims is an inadequate basis for a finding of an unconstitutional denial of due process. The possibility of big verdicts which is what gives rise to ambulance chasing is directed primarily to jury assessment of pain and suffering in personal injury situations; property damage claims are not significantly involved in the evil to which the statute is directed.[23]

Reversed.

---

[21] 371 US 415; 83 S Ct 328; 9 L Ed 2d 405 (1963).

[22] 79 Mich App 63; 261 NW2d 209 (1977). The one opinion decides the issues arising from both the indictment of Samuel Posner and that of Noel Keanne.

[23] See the last paragraph of n 6, *supra.*